AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

9:00 a.m. - 10:30 a.m.                    DISTRICT OF                    DELAWARE

Backertop Licensing LLC                          **EXHIBIT AND WITNESS LIST**

V.

Canary Connect; August Homes              Case Number:   22cv572; 22cv573-CFC

| PRESIDING JUDGE Chief Judge Colm F. Connolly | | | | PLAINTIFF'S ATTORNEY David Finger | | DEFENDANT'S ATTORNEY n/a |
|---|---|---|---|---|---|---|
| TRIAL DATE (S) 9/18/2024 | | | | COURT REPORTER B. Archer | | COURTROOM DEPUTY K. Davis |
| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES | |
| W1 | | 9/18/2024 | | | Lori LaPray - live, sworn | |
| 1 | | | X | X | Patent Assignment Cover Sheet | |
| 2 | | | X | X | Backertop Bates 447-458 | |
| 3 | | | X | X | Patent Purchase Agreement (11/10/2022, Ex. 3) | |
| 4 | | | X | X | Backertop Bates 1-12 (Backertop Engagement Letter) | |
| 5 | | | X | X | Backertop Bates 149-169 (10/18/2022 Fish & Richardson Letter to Burns) | |
| 6 | | | X | X | Backertop Bates 115-116 (emails) | |
| 7 | | | X | X | Backertop Bates 16-33 (4.10.2023 emails) | |
| 8 | | | X | X | Consulting Agreement | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

Page 1 of ____1____ Pages

**507261121     05/02/2022**

# PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

EPAS ID: PAT7308042

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT |

## CONVEYING PARTY DATA

| Name | Execution Date |
|---|---|
| TERRACE LICENSING LLC | 04/23/2022 |

## RECEIVING PARTY DATA

| | |
|---|---|
| Name: | BACKERTOP LICENSING LLC |
| Street Address: | 2100 14TH ST, SUITE 107 PMB 1044 |
| City: | PLANO |
| State/Country: | TEXAS |
| Postal Code: | 75074 |

## PROPERTY NUMBERS Total: 5

| Property Type | Number |
|---|---|
| Patent Number: | 10728382 |
| Patent Number: | 9332385 |
| Patent Number: | 9654617 |
| Patent Number: | 10477011 |
| Patent Number: | 9860366 |

## CORRESPONDENCE DATA

**Fax Number:**
***Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.***
**Email:**            linhd@ip-edge.com
**Correspondent Name:**   BACKERTOP LICENSING LLC
**Address Line 1:**      2100 14TH ST, SUITE 107 PMB 1044
**Address Line 4:**      PLANO, TEXAS 75074

| NAME OF SUBMITTER: | LORI LAPRAY |
|---|---|
| SIGNATURE: | /Lori LaPray/ |
| DATE SIGNED: | 05/02/2022 |

**Total Attachments: 2**
source=Exhibit A - Patent Assignment - Terrace to Backertop - Fully Executed#page1.tif
source=Exhibit A - Patent Assignment - Terrace to Backertop - Fully Executed#page2.tif

**EXHIBIT**
**01**

**PATENT
REEL: 059777 FRAME: 0213**

Exhibit A

## PATENT ASSIGNMENT

For good and valuable consideration, the receipt of which is hereby acknowledged, Terrace Licensing LLC, a limited liability company organized under the laws of the Texas having offices at 6001 W. Parmer Ln, Suite 370-1018, Austin, TX 78727 ("*Assignor*"), does hereby assign, transfer, and convey unto Backertop Licensing LLC, a limited liability company organized under the laws of the State of Texas having office at 2100 14th St, Suite 107 PMB 1044, Plano, TX 75074-6444, ("*Assignee*"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the "*Patent Rights*"):

      (a)    the patent applications and patents listed in the table below (the "*Patents*" or "*Patent*");

| Patent / Publication No(s). | Application No(s). | Country | Filing Date | Title of Patent(s) |
|---|---|---|---|---|
| 10728382 | 16/172,085 | US | 10/26/2018 | SELECTIVELY PROVIDING CONTENT TO USERS LOCATED WITHIN A VIRTUAL PERIMETER |
| 9332385 | 14/621,636 | US | 02/13/2015 | SELECTIVELY PROVIDING CONTENT TO USERS LOCATED WITHIN A VIRTUAL PERIMETER |
| 9654617 | 15/065,286 | US | 03/09/2016 | SELECTIVELY PROVIDING CONTENT TO USERS LOCATED WITHIN A VIRTUAL PERIMETER |
| 10477011 | 15/817,088 | US | 11/17/2017 | SELECTIVELY PROVIDING CONTENT TO USERS LOCATED WITHIN A VIRTUAL PERIMETER |
| 9860366 | 15/491,062 | US | 04/19/2017 | SELECTIVELY PROVIDING CONTENT TO USERS LOCATED WITHIN A VIRTUAL PERIMETER |

(b) any patents issuing from applications listed above (if any), and patents that may reissue from any of the Patents;

(c) the exclusive right to prosecute applications before the USPTO and foreign patent offices, including the exclusive right to decide whether to abandon patent applications

Exhibit A

and to pay or not pay maintenance fees for any of the Patents;

(d) all causes of action (whether currently pending, filed, or otherwise) and exclusive enforcement rights under the Patents including, without limitation, the sole and exclusive rights to sue, to countersue and to pursue damages, injunctive relief, and any other remedies of any kind for past, current, and future infringement;

(e) all rights to recover and collect on all future settlement agreements, and enforceable rights to collect license payments, royalties and other payments due or payable on or after the Effective Date, under or on account of any of the Patents;

(f) the exclusive right to practice the Patents, including without limitation the right to make, have made, use, sell, offer to sell, and import products and services under the Patents;

(g) the exclusive right to license and sublicense the Patents;

(h) the exclusive rights to assign, sell and alienate the Patents; and

(i) any and all other rights to the Patents.

**ASSIGNOR: Terrace Licensing LLC**

By: _____

Name: _____Duane Dorsey_____

Title: _____Managing Member_____

Date: _____04/22/2022_____

**ASSIGNEE: Backertop Licensing LLC**

By: _____

Name: _____Lori LaPray_____

Title: _____Managing Member_____

Date: _____04/23/2022_____

PATENT
REEL: 059777 FRAME: 0215

Assignment

---

# PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT |

**CONVEYING PARTY DATA**

| Name | Execution Date |
|---|---|
| TERRACE LICENSING LLC | 04/23/2022 |

**RECEIVING PARTY DATA**

| | |
|---|---|
| Name: | BACKERTOP LICENSING LLC |
| Street Address: | 2100 14TH ST, SUITE 107 PMB 1044 |
| City: | PLANO |
| State/Country: | TEXAS |
| Postal Code: | 75074 |

**PROPERTY NUMBERS  Total: 5**

| Property Type | Number |
|---|---|
| Patent Number: | 10728382 |
| Patent Number: | 9332385 |
| Patent Number: | 9654617 |
| Patent Number: | 10477011 |
| Patent Number: | 9860366 |

**CORRESPONDENCE DATA**

Fax Number:
Email:                     linhd@ip-edge.com
*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*
Correspondent Name:         BACKERTOP LICENSING LLC
Address Line 1:             2100 14TH ST, SUITE 107 PMB 1044
Address Line 4:             PLANO, TEXAS  75074

| NAME OF SUBMITTER: | LORI LAPRAY |
|---|---|
| Signature: | /Lori LaPray/ |
| Date: | 05/02/2022 |

**EXHIBIT
O 2**

Total Attachments: 2

**BACKERTOP0447**

source=Exhibit A - Patent Assignment - Terrace to Backertop - Fully Executed#page1.tif
source=Exhibit A - Patent Assignment - Terrace to Backertop - Fully Executed#page2.tif

| RECEIPT INFORMATION | |
| --- | --- |
| EPAS ID: | PAT7308042 |
| Receipt Date: | 05/02/2022 |

**BACKERTOP0448**

507261121    05/02/2022

# PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1                                                    EPAS ID: PAT7308042
Stylesheet Version v1.2

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT |

**CONVEYING PARTY DATA**

| Name | Execution Date |
|---|---|
| TERRACE LICENSING LLC | 04/23/2022 |

**RECEIVING PARTY DATA**

| | |
|---|---|
| Name: | BACKERTOP LICENSING LLC |
| Street Address: | 2100 14TH ST, SUITE 107 PMB 1044 |
| City: | PLANO |
| State/Country: | TEXAS |
| Postal Code: | 75074 |

**PROPERTY NUMBERS Total: 5**

| Property Type | Number |
|---|---|
| Patent Number: | 10728382 |
| Patent Number: | 9332385 |
| Patent Number: | 9654617 |
| Patent Number: | 10477011 |
| Patent Number: | 9860366 |

**CORRESPONDENCE DATA**

**Fax Number:**

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

| Email: | linhd@ip-edge.com |
|---|---|
| Correspondent Name: | BACKERTOP LICENSING LLC |
| Address Line 1: | 2100 14TH ST, SUITE 107 PMB 1044 |
| Address Line 4: | PLANO, TEXAS 75074 |

| NAME OF SUBMITTER: | LORI LAPRAY |
|---|---|
| SIGNATURE: | /Lori LaPray/ |
| DATE SIGNED: | 05/02/2022 |

**Total Attachments: 2**
source=Exhibit A - Patent Assignment - Terrace to Backertop - Fully Executed#page1.tif
source=Exhibit A - Patent Assignment - Terrace to Backertop - Fully Executed#page2.tif



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

MAY 3, 2022

PTAS

BACKERTOP LICENSING LLC
2100 14TH ST, SUITE 107 PMB 1044
PLANO, TX 75074

# 507261121

UNITED STATES PATENT AND TRADEMARK OFFICE
NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT RECORDATION BRANCH
OF THE U.S. PATENT AND TRADEMARK OFFICE. A COMPLETE COPY IS AVAILABLE AT THE
ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE. THE INFORMATION
CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA PRESENT IN THE PATENT
AND TRADEMARK ASSIGNMENT SYSTEM. IF YOU SHOULD FIND ANY ERRORS OR HAVE
QUESTIONS CONCERNING THIS NOTICE, YOU MAY CONTACT THE ASSIGNMENT RECORDATION
BRANCH AT 571-272-3350. PLEASE SEND REQUEST FOR CORRECTION TO: U.S. PATENT
AND TRADEMARK OFFICE, MAIL STOP: ASSIGNMENT RECORDATION BRANCH, P.O. BOX
1450, ALEXANDRIA, VA 22313.

RECORDATION DATE: 05/02/2022          REEL/FRAME: 059777/0213
                                      NUMBER OF PAGES: 3

BRIEF: ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

ASSIGNOR:
  TERRACE LICENSING LLC              DOC DATE: 04/23/2022

ASSIGNEE:
  BACKERTOP LICENSING LLC
  2100 14TH ST, SUITE 107 PMB 1044
  PLANO, TEXAS 75074

APPLICATION NUMBER: 14621636         FILING DATE: 02/13/2015
PATENT NUMBER: 9332385               ISSUE DATE: 05/03/2016
TITLE: SELECTIVELY PROVIDING CONTENT TO USERS LOCATED WITHIN A VIRTUAL
       PERIMETER

APPLICATION NUMBER: 15065286         FILING DATE: 03/09/2016
PATENT NUMBER: 9654617               ISSUE DATE: 05/16/2017
TITLE: SELECTIVELY PROVIDING CONTENT TO USERS LOCATED WITHIN A VIRTUAL
       PERIMETER

APPLICATION NUMBER: 15491062         FILING DATE: 04/19/2017
PATENT NUMBER: 9860366               ISSUE DATE: 01/02/2018
TITLE: SELECTIVELY PROVIDING CONTENT TO USERS LOCATED WITHIN A VIRTUAL
       PERIMETER

059777/0213 PAGE 2

APPLICATION NUMBER: 15817088          FILING DATE: 11/17/2017
PATENT NUMBER: 10477011              ISSUE DATE: 11/12/2019
TITLE:  SELECTIVELY PROVIDING CONTENT TO USERS LOCATED WITHIN A VIRTUAL
        PERIMETER

APPLICATION NUMBER: 16172085          FILING DATE: 10/26/2018
PATENT NUMBER: 10728382              ISSUE DATE: 07/28/2020
TITLE:  SELECTIVELY PROVIDING CONTENT TO USERS LOCATED WITHIN A VIRTUAL
        PERIMETER


ASSIGNMENT RECORDATION BRANCH
PUBLIC RECORDS DIVISION

**BACKERTOP0451**

## PATENT ASSIGNMENT AGREEMENT

This Patent Assignment Agreement ("Agreement"), made and entered into as of the date of the last signature set forth on the signature page below (the "Effective Date"), by and between Terrace Licensing LLC, a limited liability company organized under the laws of the Texas having offices at 6001 W. Parmer Ln, Suite 370-1018, Austin, TX 78727 ("Assignor") and Backertop Licensing LLC, a limited liability company organized under the laws of the State of Texas having office at 2100 14th St, Suite 107 PMB 1044, Plano, TX 75074-6444 ("Assignee") (each a "Party" and collectively the "Parties").

### WITNESSETH:

WHEREAS, Assignor is the owner of all rights, title and interest in and to the inventions (the "Inventions") as described and claimed in the Patents and Related Patents;

WHEREAS, Assignor wishes to transfer, assign and set over unto Assignee, and Assignee shall accept and assume, all rights, title and interest in and to the Patents and Related Patents (defined below) as specified in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements of the Parties contained herein, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1. **Definition.** "Patents and Related Patents" shall mean U.S. Patents 10,728,382; 9,332,385; 9,654,617; 10,477,011; and 9,860,366.

2. **Assignment of Patents and Related Patents.** Assignor hereby assigns to Assignee all right, title and interest to the Patents and Related Patents. Assignor and Assignee hereby agree to execute the form of Patent Assignment Agreement (the "Patent Assignment") attached as **Exhibit A** hereto, the terms of such Patent Assignment being fully incorporated herein. All of the rights, privileges including the benefits of any attorney client privilege or attorney work product privilege, title and interest in and to the Patents and Related Patents sold, transferred, assigned and set over to Assignee hereunder include all income, royalties, damages and payments now or hereafter due or payable with respect thereto, and the right to bring any claim, sue, counterclaim, and recover for the past, present and future infringement of the rights assigned hereunder.

3. **Limitations of Liability.** NO PARTY SHALL BE LIABLE TO ANY OTHER PARTY FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES, OR FOR ANY COSTS OF COVER, LOSS OF PROFITS OR GOODWILL, OR INTERRUPTION OF BUSINESS, UNDER OR IN RELATION TO THIS AGREEMENT, WHETHER BASED ON BREACH OF WARRANTY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR ANY OTHER THEORY, AND WHETHER OR NOT THE PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Confidential

ASSIGNOR'S CUMULATIVE LIABILITY TO ASSIGNEE FOR BREACHES OF THIS AGREEMENT SHALL NOT EXCEED THE AMOUNT OF THE PAYMENT ACTUALLY RECEIVED BY ASSIGNORS FROM ASSIGNEE. IN NO EVENT SHALL ASSIGNORS HAVE ANY LIABILITY ON ACCOUNT OF ASSIGNEE'S INFRINGEMENT OF ANY THIRD PARTY PATENTS OR OTHER THIRD PARTY INTELLECTUAL PROPERTY RIGHTS.

4. **Consideration.** Assignee hereby assumes all of the obligations of the Patent Assignment Agreement made and entered into on November 29, 2021, by and between Daedalus Blue LLC and Terrace Licensing LLC ("Prior Agreement"). Assignee agrees in writing to be bound (and agrees to require all subsequent successor in interest to be bound) by the terms and conditions applicable to Assignor with respect to the Patents and Related Patents. Assignee also understands and acknowledges that Assignor or prior owners may have granted licenses, covenants not to sue, releases, and other encumbrances with respect to the Patents and Related Patents ("Patent Encumbrances"). Assignee expressly agrees to be bound by and take the Patents and Related Patents subject to all such Patent Encumbrances. Assignor remains liable jointly and severally with Assignee and all subsequent successors in interest for all obligations of Assignor under the Prior Agreement.

5. **Closing and Post-Closing.**

a. **Notices.** All notices and communications hereunder shall be in writing and deemed given if delivered (a) personally, or (b) by overnight courier, or (c) by registered or certified mail (return receipt requested) or (d) by email to the parties at the following addresses (or at such other address for a party as shall be specified by like notice);

If to the Assignor at:
Duane Dorsey - Managing Member
Terrace Licensing LLC
6001 W. Parmer Ln, Suite 370-1018
Austin, TX 78727
info@ip-edge.com

If to Assignee at:
Lori LaPray – Managing Member
Backertop Licensing LLC
2100 14th St, Suite 107 PMB 1044
Plano, TX 75074-6444
info@ip-edge.com

b. **Entire Agreement.** This Agreement (including the Exhibits) constitutes the entire agreement of the parties regarding this transaction, and supersedes all other prior or contemporaneous agreements and understanding, both written and oral, among or

**BACKERTOP0453**

Confidential

between the parties with respect to the subject matter hereof.

c. **No Third Party Beneficiaries.**  This Agreement is for the exclusive benefit of the parties and is not intended to confer upon any other person any rights or remedies hereunder.

d. **Assignment.**  This Agreement shall not be assigned by either party without the prior written consent of the other party; provided that (a) Assignee may assign its rights and obligations hereunder without the consent of Assignor so long as such Assignee shall assume all of the obligations of this Agreement; and (b) Assignor shall have the right to assign this Agreement in its entirety to any succeeding entity that acquires all or substantially all of the assets and/or stock entitled to vote of Assignor, so long as such succeeding entity is (1) not adverse to Assignee in any suit alleging infringement of one or both of the Patents and Related Patents at time of the acquisition.

e. **Confidentiality.**  The contents of this Agreement, including its terms and conditions, are considered confidential. Neither party shall disclose the terms of the Agreement to a third party, without the prior written approval of the other party, except to legal, financial, accounting or other similar advisors, prospective and actual financiers or investors, and prospective and actual successors and assigns, who agree to keep the terms of this Agreement confidential.  Notwithstanding any statement to the contrary, this provision shall not prevent Assignee from complying with court disclosure requirements (e.g. certificate of interested parties) nor shall it prevent Assignee from bringing suit in a court of its choice.  In the event, a third party seeks to discover the terms of this Agreement through a court order, the party to whom the request or the terms has been made shall provide reasonable notice of the request to the other party to this Agreement and shall use its reasonable efforts to prevent the least disclosure of the terms of the Agreement permitted. Neither party will originate any publicity, news release, or other announcement, written or oral, whether to the public press, to stockholders, or otherwise, relating to this Agreement, to any amendment hereto or to performance hereunder or the existence of an arrangement between the parties without the prior written approval of the other party.

f. **Common Interest.** Both Parties acknowledge that there are shared common legal interests and that it is in both Parties common and individual interests to share certain confidential communications and information during the course of this Agreement. This Agreement memorializes the Parties' understanding that communications covered by the attorney-client privilege, work product immunity, or other privileges, are covered by a community of interest that exists between them with respect to the information shared under this Agreement. To the fullest extent permissible by law, the Parties intend that all applicable privileges and immunities are and will be preserved. From time to time, mutual interests of both Parties have been and will be best served by exchanging, whether orally or in writing, documents, factual materials, mental impressions, memoranda, interview reports, and other information (collectively, "Joint Materials"). These Joint Materials are protected from disclosure to adverse or other third parties as a result of attorney-client privilege, the attorney work-product doctrine, and/or other applicable privileges, immunities or confidentialities. This Agreement memorializes the Parties'

Confidential

understanding that such Joint Materials and related communications are covered by a community of interest that exists between them and that all applicable privileges and immunities have been, are, and will be preserved. No waiver of any privilege, doctrine, or other protection is or shall be implied by the exchange or disclosure of any information or documents in connection with any litigation matters, including without limitation confidential information disclosed or received pursuant to this Agreement. Neither an inadvertent disclosure nor a purposeful disclosure pursuant to this Agreement or in connection with the transactions contemplated hereby shall constitute a waiver of any privilege or protection of any Party. Upon the discovery of any inadvertent disclosure of confidential information, each Party shall undertake best efforts to restore the confidentiality, privilege, and/or immunity to that disclosed confidential information, including the retrieval of all copies thereof.  If any third party requests or demands, by subpoena or otherwise, any confidential information from Recipient or any of its representatives, contractors, consultants, partners, officers, employees, and agents, Recipient shall (i) immediately notify Discloser in writing of the request or demand to permit Discloser to assert and protect any applicable rights and privileges with respect to such materials, and (ii) decline to produce the requested confidential information unless any applicable privilege or protection is waived by the person(s) entitled to such privilege or protection or to whom such privilege or protection belong(s). Neither Recipient nor any of its representatives, contractors, consultants, partners, officers, employees, and agents may at any time waive any privileges or protections relating to Discloser's confidential information without the prior written consent of Discloser. Recipient shall take all reasonable steps necessary to permit the assertion of all applicable rights and privileges with respect to Discloser's confidential information and shall cooperate fully with Discloser in any proceeding relating to any disclosure of confidential information. In the event that a Court, administrative body, or other competent authority finds that the sharing of information between the Parties amounts to a waiver of any otherwise applicable privilege, no Party that has complied with the terms of this Agreement shall have any liability whatsoever to the other Party with respect to the waiver of privilege.

g. **Counterparts**. This Agreement may be executed in counterparts, and such counterparts may be exchanged via electronic transmission.  Each such counterpart shall be deemed an original, and all of which taken together shall be deemed a single document.


**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**ASSIGNOR: Terrace Licensing LLC**

By: _____

Name:    Duane Dorsey

Title:    Managing Member


**BACKERTOP0455**                              Confidential

Date:  04/22/2022

**ASSIGNEE: Backertop Licensing LLC**

By:

Name:  Lori LaPray

Title:  Manaing Member

Date:  04/23/2022

Confidential

Exhibit A

## PATENT ASSIGNMENT

For good and valuable consideration, the receipt of which is hereby acknowledged, Terrace Licensing LLC, a limited liability company organized under the laws of the Texas having offices at 6001 W. Parmer Ln, Suite 370-1018, Austin, TX 78727 (*"Assignor"*), does hereby assign, transfer, and convey unto Backertop Licensing LLC, a limited liability company organized under the laws of the State of Texas having office at 2100 14th St, Suite 107 PMB 1044, Plano, TX 75074-6444, (*"Assignee"*), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the *"Patent Rights"*):

(a)     the patent applications and patents listed in the table below (the *"Patents"* or *"Patent"*);

| Patent / Publication No(s). | Application No(s). | Country | Filing Date | Title of Patent(s) |
|---|---|---|---|---|
| 10728382 | 16/172,085 | US | 10/26/2018 | SELECTIVELY PROVIDING CONTENT TO USERS LOCATED WITHIN A VIRTUAL PERIMETER |
| 9332385 | 14/621,636 | US | 02/13/2015 | SELECTIVELY PROVIDING CONTENT TO USERS LOCATED WITHIN A VIRTUAL PERIMETER |
| 9654617 | 15/065,286 | US | 03/09/2016 | SELECTIVELY PROVIDING CONTENT TO USERS LOCATED WITHIN A VIRTUAL PERIMETER |
| 10477011 | 15/817,088 | US | 11/17/2017 | SELECTIVELY PROVIDING CONTENT TO USERS LOCATED WITHIN A VIRTUAL PERIMETER |
| 9860366 | 15/491,062 | US | 04/19/2017 | SELECTIVELY PROVIDING CONTENT TO USERS LOCATED WITHIN A VIRTUAL PERIMETER |

(b) any patents issuing from applications listed above (if any), and patents that may reissue from any of the Patents;

(c) the exclusive right to prosecute applications before the USPTO and foreign patent offices, including the exclusive right to decide whether to abandon patent applications

**BACKERTOP0457**

Exhibit A

and to pay or not pay maintenance fees for any of the Patents;

(d) all causes of action (whether currently pending, filed, or otherwise) and exclusive enforcement rights under the Patents including, without limitation, the sole and exclusive rights to sue, to countersue and to pursue damages, injunctive relief, and any other remedies of any kind for past, current, and future infringement;

(e) all rights to recover and collect on all future settlement agreements, and enforceable rights to collect license payments, royalties and other payments due or payable on or after the Effective Date, under or on account of any of the Patents;

(f) the exclusive right to practice the Patents, including without limitation the right to make, have made, use, sell, offer to sell, and import products and services under the Patents;

(g) the exclusive right to license and sublicense the Patents;

(h) the exclusive rights to assign, sell and alienate the Patents; and

(i) any and all other rights to the Patents.


**ASSIGNOR: Terrace Licensing LLC**

By: _____

Name: _____Duane Dorsey_____

Title: _____Managing Member_____

Date: _____04/22/2022_____


**ASSIGNEE: Backertop Licensing LLC**

By: _____

Name: _____Lori LaPray_____

Title: _____Managing Member_____

Date: _____04/23/2022_____


**BACKERTOP0458**

# PATENT PURCHASE AGREEMENT

**THIS PATENT PURCHASE AGREEMENT** (the "Agreement") is made and entered into as of November 29, 2021 (the "**Effective Date**"), between Daedalus Blue LLC, organized under the laws of Delaware, with offices at 51 Pondfield Road, Suite 3, Bronxville, NY 10708 ("**Seller**"), and Terrace Licensing LLC organized under the laws of Texas with offices at 6001 W. Parmer Ln, Suite 370-1018, Austin, TX 78727 ("**Buyer**"). Seller and Buyer are also referred to in this Agreement each as a "Party" and collectively as the "Parties."

       **WHEREAS**, Seller has the right to assign its interest in the patents and applications listed on **Exhibit A**, patents issuing from applications listed on Exhibit A, and patents that may reissue from any of the foregoing (hereinafter, the "**Patents**"), and

       **WHEREAS**, subject to the terms and conditions of this Agreement, Seller desires to assign its ownership interest in the Patents to Buyer, and Buyer desires to acquire such ownership interest in the Patents.

       **NOW, THEREFORE**, in consideration of the mutual covenants and agreements of the Parties contained herein, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.     **Acquisition and Sale of Patents**. Seller sells to Buyer, and Buyer acquires from Seller, all of Seller's right, title and interest in and to the Patents, subject to the Existing Rights. All of Seller's rights, title, interest, and privileges, including the benefit of any attorney client privilege or attorney work product privilege, in and to the Patents are sold, transferred, and assigned to Buyer hereunder, effective immediately upon the Effective Date, subject to the Existing Rights. The sale of all of Seller's right, title and interest in the Patents includes, subject to the Existing Rights, all of Seller's rights in and to (a) all causes of action (whether currently pending, filed, or otherwise) and exclusive enforcement rights under the Patents including, without limitation, the sole and exclusive rights to sue, to countersue and to pursue damages, injunctive relief, and any other remedies of any kind for past, current, and future infringement; (b) all rights to recover and collect on all future settlement agreements, and enforceable rights to collect license payments, royalties and other payments due or payable on or after the Effective Date, under or on account of any of the Patents; (c) the exclusive right to practice the Patents, including without limitation the right to make, have made, use, sell, offer to sell, export, and import products and services under the Patents; (d) the exclusive right to license and sublicense the Patents; (e) the exclusive rights to assign, sell and alienate the Patents; (f) the exclusive right to prosecute applications before the USPTO and foreign patent offices, including the exclusive right to decide whether to abandon patent applications and to pay or not pay maintenance fees for any of the Patents; and (g) any and all other rights to the Patents. For the avoidance of doubt, (i) Buyer shall not receive, and shall have no right to obtain, any license payments, royalties or other payments or consideration paid to Seller prior to the Effective Date on account of or in respect to the Patents; and (ii) beginning as of the Effective Date, Seller will not have any right of enforcement, including, without limitation, any rights to sue or to pursue damages, injunctive relief, or any other rights and remedies

*Exhibit 3*
*11/10/2022*

**EXHIBIT**
**O3**

or any kind for past, current or future infringement of any of the Patents against any third party, or any rights to control or participate in any such enforcement.

2. **Consideration**. Seller shall be entitled to a 49% share of the Net Proceeds in perpetuity (the "**Net Proceeds Percentage**").

   a. **Payment of the Net Proceed Percentage**. Payment of the Net Proceeds Percentage shall be paid to Seller within ten business days from the last day of the calendar quarter after Net Proceeds are received by Buyer (the "**Net Proceeds Percentage Payments**") or any Subsequent Assignee (as defined herein). All payments made by Buyer or any Subsequent Assignee shall be made by wire transfer or check to an account specified by Seller. At the time of each payment, subject to confidentiality, Buyer or any Subsequent Assignee shall provide to Seller a report setting forth each transaction generating Gross Monetization Proceeds and the calculation of the Net Proceeds Percentage Payment amount under this Agreement.

3. **Compliance with Existing Rights**. The assignment set forth in Section 1 is subject to all rights granted to others or required or permitted to be granted to others, including but not limited to all licenses, immunities, releases, and covenants not to sue, under the Existing Rights. Buyer acknowledges that it has been informed of and has received copies of the IBM, Oracle, and Uber Agreements pursuant to a non-disclosure agreement, and agrees (a) to abide by the IBM, Oracle and Uber Agreements, (b) to include in any subsequent assignment, transfer or exclusive license agreements involving the Patents a provision explicitly requiring the transferee under such agreements (i) to abide by the IBM, Oracle and Uber Agreements, and (ii) to require all subsequent transferees of the Patents to abide by the IBM, Oracle, and Uber Agreements; (c) that IBM, Oracle and Uber, and any third persons or entities having rights of enforcement under the IBM, Oracle and Uber Agreements, shall have the right to enforce their rights under such respective Agreements against Buyer and any subsequent transferees. For the avoidance of doubt, the Existing Rights shall run with the Patents. Buyer acknowledges that Seller's predecessors-in-interest may have made or offered to make one or more of the Patents subject to the express or implied licensing obligations of a standards body or patent pool. Accordingly, Buyer acknowledges and agrees that the sale and assignment of the Patents shall be subject to, and Buyer shall abide by, and shall require any subsequent transferees of the Patents to abide by, all obligations arising out of such express or implied licensing obligations that relate to the Patents. Buyer further agrees that to the extent any of the Patents was made under a government contract that it takes this assignment subject to all applicable government rights and that it will comply with all applicable laws and regulations with respect to such Patents.

4. **No Assumption of Liabilities**. Except for Existing Rights, it is expressly understood and agreed that Buyer shall not be liable for and hereby disclaims any assumption of any of the obligations, third party claims or liabilities of Seller and/or its Affiliates and/or of any third party of any kind or nature whatsoever arising from or in connection with any

- 2 -

circumstance, cause of action, breach, violation, default or failure to perform with respect to the Patents prior to the Effective Date.

5. **Identification of Unlicensed Persons.** Seller represents and warrants that it has provided to Buyer true and accurate copies of relevant portions of the Oracle, Uber, and IBM Agreements, and Buyer acknowledges receipt of the copies provided by Seller, and Seller further represents and warrants that it has provided to Buyer an accurate listing of, and Buyer acknowledges receipt of (a) an identification of entities as to which IBM has provided licensing status information, and (b) an identification of entities as to which Seller requested licensing status information from IBM.

6. **Due Diligence**. Buyer warrants that it has had the opportunity to and has conducted its own due diligence concerning the IBM, Oracle, and Uber Agreements, and concerning the identification of entities noted in Section 5, and that it is not relying on any warranty or representation of Seller concerning the same, except as set forth in Section 5.

7. **Taxes; Brokers**. Seller shall pay any taxes that are legally imposed on Seller arising out of the transfer of the Patents or receipt of Net Proceeds Percentage Payments under this Agreement. Seller is not liable for any taxes, if any, that are legally imposed on Buyer arising out of the transfer of the Patents. Seller is responsible for any fees (including legal and broker fees) incurred by Seller and Buyer is responsible for any fees (including legal and broker fees) incurred by Buyer. In any case where taxes are withheld, Buyer shall provide Seller with all documentation relating to withheld taxes, including receipts necessary to claim the applicable credit. Each Party agrees to cooperate with the other regarding any tax forms or submissions to be made by such other Party to any tax authorities in any country with respect to this Agreement or the transactions contemplated hereby, and to cooperate in any efforts to minimize taxes to be paid by such other Party with respect to this Agreement or the transactions contemplated hereby, without, however, prejudicing any of its rights under this Agreement.

8. **Representations and Warranties of Seller**. Seller hereby represents and warrants to Buyer as follows that, as of the Effective Date:

 a. Seller has the full power and authority, and has obtained all third-party consents, approvals or other authorizations required, to enter into this Agreement and to carry out its obligations hereunder, including, without limitation, the assignment of the Patents to Buyer. This Agreement has been duly executed and delivered by Seller, and constitutes legal, valid and binding obligations of Seller, enforceable in accordance with their terms. To Seller's knowledge, as of the Effective Date, neither the execution and delivery of, or Seller's performance under, this Agreement, nor the assignment of the Patents to Buyer contemplated under and subject to the terms and conditions of this Agreement, would breach any obligation of Seller under any existing contracts to which Seller is a party.

 b. The Patents are, as of the Effective Date, free and clear of any and all liens, claims, mortgages, encumbrances and security interests that arise from Seller's actions or

from agreements to which Seller is a party, other than the Existing Rights. Seller has not received notice of any actions, claims or proceedings threatened, pending or in progress relating in any way to any of the Patents.

c.    Seller has the full right and power to assign and transfer all of its rights in each of the Patents.

d.    Seller has not received any notice from the USPTO or any governmental patent agency of any re-examinations, reissues, interferences, oppositions, or similar proceedings involving the Patents. During the period while Seller has owned rights in the Patents, the Patents have not been subject to any action, claims, or proceedings threatened, pending, or in progress involving the Patents, including relating to their validity, enforceability, inventorship or ownership. To Seller's knowledge, none of the Patents is currently involved in any inter partes review, reexamination, reissue or interference proceeding or any similar proceeding, and to Seller's knowledge no such proceedings are pending or threatened.

e.    During the period while Seller has owned rights in the Patents, none of the Patents has ever been found invalid, unpatentable, or unenforceable for any reason in any administrative, arbitration, judicial or other proceeding.

f.    During the period while Seller has owned rights in the Patents, no Patent has been exclusively licensed either to a subsidiary of Seller or to a third party.

g.    Seller has not initiated any enforcement action with respect to any of the Patents.

9.    **Representations And Warranties Of Buyer.** Buyer hereby represents and warrants to Seller as follows that, as of the Effective Date and thereafter until the last to expire of the Patents:

a.    Buyer has the full power and authority to carry out its obligations hereunder. This Agreement has been duly executed and delivered by Buyer, and constitutes legal, valid and binding obligations of Buyer, enforceable in accordance with their terms.

b.    Buyer's execution, delivery, and performance of its obligations under this Agreement will not conflict with or violate any laws to which Buyer is subject, or any agreement or other obligation directly or indirectly applicable to Buyer.

10.    **Exceptions to Warranties.** EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTIONS 5, 6, 8 AND 9 HEREOF:

a.    NOTHING CONTAINED IN THIS AGREEMENT SHALL BE CONSTRUED AS: (A) A WARRANTY OR REPRESENTATION OF ANY PARTY AS TO THE VALIDITY, ENFORCEABILITY OR SCOPE OF ANY INTELLECTUAL PROPERTY RIGHT TRANSFERRED HEREUNDER; OR (B) A WARRANTY OR REPRESENTATION THAT THE EXERCISE OF ANY OF THE RIGHTS

- 4 -

GRANTED HEREUNDER WILL BE FREE FROM INFRINGEMENT OF THE INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES.

b. THE PATENTS AND OTHER RIGHTS TRANSFERRED UNDER THIS AGREEMENT ARE BEING PROVIDED "AS IS" WITH NO WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF NON-INFRINGEMENT, MERCHANTA-BILITY AND FITNESS FOR A PARTICULAR PURPOSE.

11. **Active Maintenance and Enforcement**

a. **Ongoing Monetization.** Buyer agrees that Buyer will use reasonable efforts to begin actively licensing, enforcing or otherwise monetizing the Patents ("**Monetization**") within 180 days after the Effective Date. For the purposes of clarity, sending a notice letter of infringement of a Patent or filing a litigation concerning infringement of a Patent constitutes Monetization and shall be deemed to be within compliance of the requirements of this Paragraph.

b. **Cooperation from Seller.** Seller will reasonably cooperate with Buyer in a timely manner with respect to Buyer's enforcement actions and other monetization and maintenance efforts related to the Patents. This includes, but is not limited to, attending meetings by phone or in person upon reasonable notice from Buyer, providing to Buyer all non-privileged documents in Seller's possession related to the Patents, cooperating for purposes of meeting discovery obligations and providing testimony at deposition and trial. Buyer agrees to reasonably compensate Seller for time and expenses incurred by Seller for such cooperation. Notwithstanding the above, Buyer shall not: (i) voluntarily join or implead Seller, either directly or through an intermediary or Affiliate, as a party in any litigation or administrative proceeding involving a claim of infringement by a third party of the Patents; or (ii) undertake voluntarily a position that Seller is or should be a necessary or indispensable party for the purpose of any litigation or administrative proceeding involving a claim infringement by any third party of the Patents. If Seller is involuntarily joined as a party, Buyer shall take all steps reasonably requested by Seller to attempt to remove Seller from the litigation.

12. **Closing.**

a. **Deliveries.** Except as set forth below, on the Effective Date, the Seller will deliver to the Buyer the following:

i. for U.S. patents, duly executed copies of patent assignment documents substantially in the form attached in **Exhibit B**;

ii. for non-U.S. patents, within 60 days of the Effective Date such other duly executed agreements, deeds, certificates or other instruments of conveyance, transfer and assignment as necessary, in the reasonable opinion of the Buyer, to vest in the Buyer good, valid and marketable title and all

- 5 -

rights and interest to such Patents, such documents to be provided by Buyer to Seller at Buyer's expense along with any translations, if applicable, by no later than 45 days after the Effective Date;

    iii.    docket report as specified in Section 13.

    b.  **Post-Closing Cooperation**.    Following the Effective Date, upon Buyer's reasonable request, Seller shall reasonably cooperate with Buyer to perfect, record and secure title in and to the Patents, at Buyer's expense.

13.    **Prosecution Fees, Maintenance Fees and Annuity Payments.** Seller shall verify that all United States and foreign prosecution and patent fees (including but not limited to annuity fees, maintenance fees, professional fees for prosecution services) for the Patents having a final due date prior to the Effective Date have been paid; provided that nothing herein requires Seller to pay maintenance or other fees for Patents abandoned prior to the Effective Date. Seller shall provide a docket report of all due dates and all fees due with respect to the Patents. Buyer shall be responsible for, but have no obligation to pay, all United States and foreign prosecution and patent fees (including but not limited to annuity fees, maintenance fees, professional fees for patent or prosecution services) for the Patents arising or having a final due date on or after to the Effective Date.

14.    **Common Interest Agreement.** Seller and Buyer recognize that they share common interests, including but not limited to common legal interests relating to the scope, infringement, validity, and enforceability of the Patents, as contemplated in this Agreement ("**Common Interest**"). In furtherance of the Common Interest, the Parties or their counsel may exchange information that is attorney-client privileged or work product, including without limitation communications (whether oral or written), documents, things, mental impressions, factual materials, memoranda, or opinions relating to the Patents (such information, the "**Common Interest Information**"). The Parties acknowledge and agree that they desire and intend by this Agreement that the common interest privilege, to the fullest extent permitted by law, attaches to any Common Interest Information exchanged, and that no such exchange of Common Interest Information between the Parties or their counsel shall waive any applicable privilege or protection to such Common Interest Information.

15.    **Miscellaneous**

    a.    **Confidentiality of Terms.** The Parties hereto will keep the terms of this Agreement confidential and will not now or hereafter disclose this Agreement or the terms hereof to any third party except (a) with the prior written consent of the other Party; (b) as otherwise may be required by law, regulatory agency or legal process; (c) during the course of litigation, so long as the disclosure of such terms and conditions is restricted in the same manner as is the confidential information of other litigating parties; (d) the Parties may disclose this Agreement or its contents to the extent reasonably necessary, on a confidential basis, to its accountants and attorneys, to actual or potential investors, potential or actual subsequent assignees

- 6 -

of one or more of the Patents of this Agreement or rights hereunder, financial advisors, and lenders, and to any third party litigation funders; (e) in confidence, to holders of Existing Rights under the Patents; (f) in confidence, to any other third party having a legitimate business need to know. The Non-Disclosure Agreement entered into between the Parties shall remain in effect pursuant to its terms. Notwithstanding the above, Buyer acknowledges and agrees that the Uber, Oracle and IBM Agreements may be disclosed only according to their terms, including any necessary consents.

b.   **Integration Clause.** This Agreement sets forth the entire understanding and agreement between the Buyer and the Seller and supersedes all previous communications, negotiations, understandings, and agreements, whether oral or written, with respect to the subject matter hereof.

c.   **Amendment.** This Agreement may not be amended or changed except in a writing signed by both the Buyer and the Seller.

d.   **Severability.** If any provision of this Agreement is declared to be invalid, illegal or unenforceable, then that provision will be considered severed from the remainder of the Agreement and will not affect the validity of the remaining provisions of the Agreement.

e.   **Construction of Agreement**. Each Party has cooperated in the drafting and preparation of this Agreement. Hence, in any construction to be made of this Agreement, it shall not be construed against a Party merely because such Party may have drafted all or part of this Agreement. The headings in this Agreement are for convenience only, and are not to be used in the construction or interpretation of this Agreement.

f.   **Relationship of Parties**. The Parties hereto are independent contractors. Neither Party has any express or implied right or authority to assume or create any obligations on behalf of the other or to bind the other to any contract, agreement or undertaking with any third party. Nothing in this Agreement shall be construed to create a partnership, joint venture, employment or agency relationship between Seller and Buyer.

g.   **Waiver.** Failure by either Party to enforce any term of this Agreement shall not be deemed a waiver of future enforcement of that or any other term in this Agreement.

h.   **Safe Harbor**. In the case of breach of this Agreement by either Party, the allegedly breaching Party must be provided written notice of the alleged breach. Such an alleged breach shall not be considered a breach and there shall be no damages for the alleged breach of this Agreement if the allegedly breaching Party cures it within 30 days of such written notice.

i.   **Notices**.   All notices and communications under this Agreement shall be deemed to have been duly given and made if in writing and if served by personal delivery

- 7 -

upon the Party for whom it is intended or delivered by registered or certified mail, return receipt requested, to the Person at the address set forth below, or such other address as may be designated in writing hereafter, in the same manner, by such Person:

To Seller:

Daedalus Blue LLC
51 Pondfield Road, Suite 3
Bronxville, New York 10708
Email:  ed@daedalusgroupllc.com
Telephone: (914) 424-2778
Attn:  Ed Gomez


To Buyer:
Terrace Licensing LLC
Attn: Managing Member – Duane Dorsey
6001 W. Parmer Ln, Suite 370-1018
Austin, TX 78727
info@ip-edge.com

16.   **Limitation on Damages.** (a) NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR LOSS OF PROFITS, OR ANY OTHER INDIRECT OR SPECIAL, CONSEQUENTIAL, PUNITIVE OR INCIDENTAL DAMAGES, HOWEVER CAUSED, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGE; (b) EXCEPT FOR BREACHES OF SECTION 2, 8, AND 11(a), THE AGGREGATE LIABILITY OF EACH PARTY FOR ANY AND ALL CLAIMS RELATING TO OR ARISING UNDER THIS AGREEMENT, SHALL NOT EXCEED THE TOTAL AMOUNT OF $25,000.00.

17.   **Governing Law: Forum.** The Parties agree that any dispute between them regarding any matter related to or arising out of this Agreement, or any Party's performance under this Agreement, shall be resolved by confidential arbitration in New York, NY. All Parties hereby waive any claim that New York, NY is an inconvenient forum, or that either personal or subject matter jurisdiction is lacking in New York, NY. This Agreement shall in all respects be interpreted, enforced and governed by the law of the State of New York, regardless of the effect of any choice of law principles that might otherwise apply. Arbitration may be demanded by the sending of written notice to another Party. Final and binding arbitration shall occur before a mutually agreed arbitrator, before and pursuant to the then applicable rules of Judicial Arbitration and Mediation Services, Inc. ("**JAMS**"). The single arbitrator shall be selected pursuant to Rule 15 of the JAMS Comprehensive Arbitration Rules and Procedures. The prevailing Party in any arbitration, or in any litigation between the Parties, shall be awarded reasonable attorney's fees and costs from the non-prevailing Party. This final and binding arbitration provision constitutes a mandatory alternative dispute resolution process, is in lieu of traditional court proceedings,

- 8 -

is without a right to a jury or to court trial or appeal, and all differing court proceeding rights including without limitation to a jury are accordingly waived.

18.  **Opportunity to Confer with Counsel.**  Each party acknowledges that it has been represented by independent legal counsel of its own choice throughout all of the negotiations concerning the terms of this Agreement.  Each party further acknowledges that it has had adequate opportunity to make whatever investigation or inquiry it deems necessary or desirable in connection with the subject matter of this Agreement prior to the execution hereof.

19.  **Assignment.**  Seller and its Affiliates may assign their respective rights under this Agreement to their respective successors in interest provided that (a) Seller remains liable jointly and severally with such successor in interest for all obligations of Seller under this Agreement and (b) such successor in interest agrees in writing to be bound (and agrees to require all subsequent successor in interest to be bound) by the terms and conditions applicable to Seller with respect to the Patents.  Buyer may assign this Agreement or any of its rights or obligations hereunder, including any one or more of the Patents to a third party (a "Subsequent Assignee," and each successor assignee of any such rights also a Subsequent Assignee), provided that (a) Buyer remains liable jointly and severally with each Subsequent Assignee for all obligations of Buyer under this Agreement and (b) each Subsequent Assignee agrees in writing to be bound (and agrees to require all subsequent transferees to be bound) by the terms and conditions applicable to Buyer with respect to the Patents; and (c) upon Seller's request, Buyer (or each Subsequent Assignee in the case of any further assignments) shall provide notice to Seller of an assignment, should any exist, including an identification of what was assigned, within 30 days of such request. Buyer shall ensure that any transfer, by assignment or otherwise, of this Agreement or any rights hereunder, or any of the Patents by Buyer, or by any assignee of the Agreement, any rights hereunder, or any Patents, to any party shall be subject to all of Seller's rights under this Agreement and to the Existing Rights.

20.  **No Other Rights.**

  a.  Except for the assignment of Patents and any other rights expressly set forth in this Agreement, no license, immunity, ownership interest, or other right is granted to Buyer under this Agreement, either directly or by implication, estoppel, or otherwise, including any other patents assigned to Seller or its Affiliate under the IBM Agreement.  Without limiting the foregoing, no license or other right is granted by this Agreement to practice any other patent, application for patent, or other intellectual property right of Seller or its Affiliate, even if required for the practice or enforcement of a Patent or sharing a common priority with a Patent.

  b.  Except for the interest in Net Proceeds and the rights of Seller as expressly set forth in this Agreement, no license, immunity, ownership interest, or other right in or under the Patents or in Buyer is granted to Seller under this Agreement, either directly or by implication, estoppel, or otherwise, including any other patents owned by Buyer or any Affiliate of Buyer.

- 9 -

21.   **Definitions.**

a.    "**Affiliate(s)**" means any entity now or hereafter that a Party owns or controls, is controlled by, or under common control with, a greater than fifty percent (50%) beneficial or equitable ownership interest, directly or indirectly.  With respect to Seller, "Affiliate" includes without limitation Daedalus Group LLC and Daedalus Prime LLC.

b.    "**Costs**" means, excluding Fees as defined below, all costs and expenses (not including operating expenses or fixed costs) directly attributable to monetization efforts for the Patents, in particular:  (1) out-of-pocket litigation costs directly attributable to the monetization, licensing and/or enforcement of the Patents; (2) out-of-pocket consulting and expert fees (e.g., infringement expert, validity expert, technical expert, damages expert(s)) directly attributable to the monetization, licensing and/or enforcement of the Patents, whether on an hourly or contingency basis; (3) out-of-pocket costs and fees incurred in defending against any adversarial proceeding relating to the Patents, including but not limited to *Inter Parties Review* and reexaminations; and (4) maintenance and annuity costs and prosecution costs and fees with respect to the Patents, for supporting the monetization, licensing and/or enforcement of the Patents.

c.    "**Existing Rights**" means the existing licenses, sublicenses, and other rights and obligations (as set forth below in this definition) under the Patents that were in existence prior to the Effective Date, including, without limitation, any covenants not to sue, standstill agreements, and releases that by their terms run with the Patents or with which a subsequent assignee of the Patents must comply, and specifically including the rights of IBM, Oracle, Uber and other third parties under the IBM Agreement, Oracle Agreement, and Uber Agreement.

d.    "**Fees**" means the reasonable amount of fees (excluding Costs) paid to outside attorneys and law firms, as compensation, contingent or otherwise, for achieving any Gross Monetization Proceeds, including defense of any post-grant proceeding. Such fee arrangements shall be reasonable and in accordance with market rates for such legal services.

e.    "**Gross Monetization Proceeds**" means all gross, pre-tax monetary recovery and/or other consideration from the sale, licensing, settlement, award and/or other monetization activities actually received by Buyer (or any Subsequent Assignee) related to the Patents.  Non-monetary consideration received by Buyer (or any Subsequent Assignee) shall be included within Gross Monetization Proceeds when liquidated or to the extent otherwise converted to liquid proceeds.  Notwithstanding the foregoing, Seller acknowledges and agrees that gross revenues and/or other consideration from the sale, licensing and/or other monetization activities related to the foregoing Patents after the Effective Date may be subject to foreign withholding, which is outside the Buyer's control, and in such event, for purposes

of this Agreement Gross Monetization Proceeds shall be net of any such foreign withholding unless and until such foreign withholding is recovered.

f.      **"IBM Agreement"** means the agreement entitled Patent Assignment Agreement entered into between International Business Machines Corporation ("IBM") and Daedalus Group LLC executed on September 30, 2019, as amended.

g.      **"Net Proceeds"** means Gross Monetization Proceeds minus Fees minus Costs.

h.      **"Oracle Agreement"** means (collectively) the agreements entitled Settlement Agreement and Release, and Patent License Agreement, entered into between Oracle Corporation and Oracle America, Inc. (together, "Oracle") and Daedalus Blue LLC having an effective date of July 23, 2020.

i.      **"Subsequent Assignee"** shall have the meaning set forth in Section 19.

j.      **"Uber Agreement"** means the agreement entitled Patent Agreement entered into between Uber Technologies, Inc. and Daedalus Group LLC dated as of January 12, 2021.

*[signature page to follow]*

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**SELLER: Daedalus Blue LLC**

By: *Ed Gomez*
_____

Name: Ed Gomez
Title: Managing Principal
Date: November 29. 2021

**BUYER: Terrace Licensing LLC**

By: _____

Name:  Duane Dorsey
Title:   Managing Member
Date: November 29 2021

- 12 -

**EXHIBIT A**
**ASSIGNMENT OF PATENT RIGHTS**

For good and valuable consideration, the receipt of which is hereby acknowledged, Daedalus Blue LLC, organized under the laws of Delaware, with offices at 51 Pondfield Road, Suite 3, Bronxville, NY 10708 (*"Assignor"*), does hereby sell, assign, transfer, and convey unto Terrace Licensing LLC, a Texas Limited Liability Company with offices at 6001 W. Parmer Ln, Suite 370-1018, Austin, TX 78727 (*"Assignee"*), all of Assignor's right, title, and interest in and to the following (collectively, the *"Assigned Patent Rights"*):

(a) the patents and patent applications listed in Exhibit A (the "Patents");

(b) any patents issuing from applications listed on Exhibit A, and patents that may re-issue from any of the Patents;

(c) the exclusive right to prosecute applications before the USPTO and foreign patent offices, including the exclusive right to decide whether to abandon patent applications and to pay or not pay maintenance fees for any of the Patents;

(d) all causes of action (whether currently pending, filed, or otherwise) and exclusive enforcement rights under the Patents including, without limitation, the sole and exclusive rights to sue, to countersue and to pursue damages, injunctive relief, and any other remedies of any kind for past, current, and future infringement;

(e )all rights to recover and collect on all future settlement agreements, and enforceable rights to collect license payments, royalties and other payments due or payable on or after the Effective Date, under or on account of any of the Patents;

(f) the exclusive right to practice the Patents, including without limitation the right to make, have made, use, sell, offer to sell, and import products and services under the Patents;

(g) the exclusive right to license and sublicense the Patents;

(h) the exclusive rights to assign, sell and alienate the Patents; and

(i) any and all other rights to the Patents.

Assignor hereby authorizes the respective patent office or governmental agency in each jurisdiction to issue any and all future patents, certificates of invention, utility models or other governmental grants or issuances that may be granted upon any of the Assigned Patent Rights in the name of Assignee, as the assignee to the entire interest therein. This Assignment of Patent Rights will inure for the benefit of any permitted successors or assigns of Assignee.

Assignor will, at the reasonable request of Assignee and at Assignee's expense, take all reasonable steps necessary and proper, to confirm the assignment to Assignee of the Assigned Patent Rights pursuant to this Assignment of Patent Rights, including without limitation, the execution, acknowledgment, and recordation of specific assignments, oaths, declarations, and other documents on a country-by-country basis, to assist Assignee in obtaining and perfecting the Assigned Patent Rights.

The assignment herein is subject to the existing licenses, sublicenses, and other rights and obligations under the Assigned Patent Rights that have been (i) granted to third parties by Assignor; or (ii) granted or retained by prior owners or inventors of the Assigned Patent Rights, in each case, prior to the date of this Assignment of Patent Rights, including, without limitation, any covenants not to sue, standstill agreements, and releases that by their terms run with the Assigned Patent Rights or which a Assignor is required to have a subsequent assignee of the Assigned Patent Rights comply with.

For the avoidance of doubt, it is the intention of the Assignor, pursuant to this Assignment of Patent Rights, to transfer to Assignee the complete bundle of rights of Assignor in the Patents, including the right to seek all remedies under law and equity in any appropriate forum or jurisdiction.

IN WITNESS WHEREOF this Assignment of Patent Rights is executed on February 28, 2022.

**Assignor: DAEDALUS BLUE LLC:**

By: _____
Name: Ed Gomez
Title: Managing Principal

**Assignee: TERRACE LICENSING LLC:**

By: _____
Name: Duane Dorsey
Title: Managing Member

| Patent / Publication Number | Country | Title |
|---|---|---|
| 20200380105 | US | System and method for real world biometric analytics through the use of a multimodal biometric analytic wallet |
| 20200313430 | US | Configuring, optimizing, and managing micro-grids |
| 20200301443 | US | Discovery and monitoring of an environment using a plurality of robots |

## AMENDMENT TO PATENT PURCHASE AGREEMENT

AMENDMENT ("Amendment") dated as of February 28, 2022, ("Amendment Date"), to the PATENT PURCHASE AGREEMENT dated November 29, 2021 (hereinafter "Agreement") between Daedalus Blue LLC, a Delaware corporation ("ASSIGNOR"), and Terrace Licensing LLC. ("ASSIGNEE"), a Texas corporation, on the other hand.

WHEREAS, ASSIGNOR has identified an additional three (3) patents ("Additional Patents") to be assigned to ASSIGNEE and the parties agree to amend the Agreement to include the Additional Patents;

WHEREAS, ASSIGNOR has the right to assign its interest in the Additional Patents as defined below; and

WHEREAS, subject to the licenses and obligations from ASSIGNOR, ASSIGNEE desires to acquire such ownership interest in the Additional Patents;

Now therefore, in consideration as specified in the Agreement, ASSIGNOR and ASSIGNEE agree as follows:

A.       Amendments to Agreement

1)   Add the following Additional Patents to the end of Exhibit A (THE PATENTS):

| Patent / Publication Number | Country | Title |
|---|---|---|
| 20200380105 | US | System and method for real world biometric analytics through the use of a multimodal biometric analytic wallet |
| 20200313430 | US | Configuring, optimizing, and managing micro-grids |
| 20200301443 | US | Discovery and monitoring of an environment using a plurality of robots |

B.      Except as amended by this Amendment, all the rights, obligations and liabilities of the parties under the Agreement shall otherwise remain in full force and effect as set out therein.

C.      The assignment herein is subject to the existing licenses, sublicenses, and other rights and obligations under the Assigned Patent Rights that have been (i) granted to third parties by Assignor; or (ii) granted or retained by prior owners or inventors of the Assigned Patent Rights, in each case, prior to the date of this Assignment of Patent Rights, including, without limitation, any covenants not to sue, standstill agreements, and releases that by their terms run with the Assigned Patent Rights or which a Assignor is required to have a subsequent assignee of the Assigned Patent Rights comply with.

D.      This Amendment may be signed in one or more counterparts, each of which, when signed and delivered, shall be deemed to be an original. All such counterparts together shall constitute one and the same valid and binding agreement, even if all of the parties have not signed the same counterpart. Signatures to this Amendment may be delivered by facsimile, in which case the facsimile copy of an original signature shall be deemed to be an original signature.

The Agreement, as amended by this Amendment, and its Exhibits and their attachments embody the entire understanding of the parties with respect to the Additional Patents and merges all prior discussions between the parties. Neither party shall be bound by any condition, definition, warranty, understanding, or representation with respect to the subject matter hereof other than as expressly provided herein.

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be duly executed as of the day and year first above written.

**ASSIGNOR: Daedalus Blue LLC**

By: _____
Name: Ed Gomez
Title: Managing Principal
Date: February 28, 2022

**ASSIGNEE: Terrace Licensing LLC**

By: _____
Name: Duane Dorsey
Title: Managing Member
Date: February 28, 2022

# FRESH

FRESH IP, PLC

**RON BURNS**
Direct Dial: (972) 632-9009
Email: ron@freship.com

This letter sets forth the agreement (**"*Agreement*"**) made this 27th day of April, 2022 (the "***Effective Date***" of this Agreement) between the law firm of FRESH IP, PLC (the "***Firm***") and Backertop Licensing LLC (the "***Client***").  Client and Firm may be hereinafter referred to collectively as the "***Parties***" or individually as a "***Party***."

## 1.   Scope of Representation.

The scope of the Firm's representation of Client ("***Scope***") is limited to licensing, litigation, and monetization of the Patents listed in Exhibit A ("***Client Patents***") and, to the extent owned by Client, any patent rights related to the Client Patents, including any divisional, continuation, continuation-in-part, reissue patent, reexamination certificate, or foreign counterpart of any such patent rights that is issued or may be issued as a result of any patent application, reissue application or re-examination (the "***Patent Rights***").

Client is executing this Agreement for the purpose of retaining Firm to represent it in connection with investigating and asserting claims, and the filing and prosecution of lawsuits, against infringers of the Client Patents and Patent Rights, (collectively referred to as "***Infringers***"). Any such claim as to which Firm files litigation against Infringers is referred to herein as a "***Lawsuit***." The Scope may also include representing Client as co-counsel and/or in support of other lead counsel, to the extent it is ethically acceptable and allowable by law, rule, or court order, in any inter partes review proceeding of the Client Patents, if such inter partes review proceeding has been or is filed while this Agreement is in force. The Scope may also include representing inventors of the Client Patents in any depositions related to any Lawsuit filed by Firm under this Agreement, subject to the Firm's sole and absolute discretion.

Without limiting the foregoing, the Scope does include representation for any (i) ex parte reexamination of any patents, (ii) enforcement of any settlement or judgment, or (iii) tax planning.

## 2.   Client's Patent Rights.

Client represents and warrants that it owns full, clear and unencumbered title and the exclusive right to enforce all rights with respect to the Client Patents and Patent Rights, including, without limitation, the exclusive right to bring actions against others for infringement of the Client Patents, to license and sublicense the Client Patents, and to collect all royalties (past or future), license fees, profits or other revenue or valuable consideration to be paid or exchanged by anyone else for the right to use the Client Patents and other existing Patent Rights.  Client is not aware of any security interest in or claims of equitable title to the Client Patents or Patent Rights. Client agrees not to transfer or assign the Client Patents or the Patent Rights, including title to or any interest in or any authority to enforce those rights while this Agreement is in force without notice to Firm.

5999 CUSTER ROAD, SUITE 110-507
FRISCO, TX 75035

**BACKERTOP0001**

**EXHIBIT**
**04**

Confidential Attorney-Client Privilege

3. **Investigation and Initiation of Lawsuits.**

Client and Firm will analyze the Patent Rights and the activities of Infringers. Firm, after consultation with and approval of Client, may file a Lawsuit pursuing claims for infringement of the Patent Rights against any Infringer, or in advance of licensing negotiations if the Parties believe that doing so is in the best interests of Client. For the avoidance of doubt, Client may negotiate license agreements with third parties without the assistance of Firm for which Firm will not receive compensation so long as Firm did not provide any form of assistance – including, but not limited to, Firm work product. Client agrees to notify and keep Firm apprised on all such licensing negotiations and agreements. This shall be accomplished by Firm's request to the Client as to whether there are licensing negotiations and agreements that the Firm is not providing any form of assistance for. Client shall be required to provide a response indicating and summarizing any such activity. Client shall not be required to disclose any other information to Firm – except, to the extent the Firm has need for such information in connection with any Lawsuit that Firm is conducting on behalf of Client – Client agrees to discuss in good faith and to provide such information to Firm. Client may also hire separate legal counsel to assert the Client Patents in the event that Firm refuses to file a case against a given Infringer, but solely as to that Infringer.

4. **Law Firm Authority to Act for Client.**

Client hereby appoints Firm as its agent to enforce, through litigation and negotiations, the Client Patents and Patent Rights against the Infringers that Firm files suit against during the term of this Agreement, except as expressly set forth below. Client authorizes Firm to try a Lawsuit, and/or negotiate, compromise, settle, and receive for and in Client's name, all compensation, damages or property to which Client may become entitled by reason of any Lawsuit. Client agrees not to enter into any licensing agreement or Lawsuit settlement concerning a Lawsuit filed by Firm without consultation with Firm. Firm agrees not to enter into any licensing agreement or Lawsuit settlement with an Infringer without the written consent of Client. Client shall have the sole and exclusive right to approve, accept and enter into any licensing agreement or Lawsuit settlement. The Parties also shall provide each other with reasonable notice of any offer made by any Infringer in connection with any Lawsuit in which Firm is involved.

5. **Mutual Support and Cooperation.**

Client agrees to: (1) allow Firm reasonable and timely access to appropriate Client personnel to facilitate the provision of legal services by Firm; (2) to use commercially reasonable efforts to preserve and provide Firm with all information and documents in the possession of Client or any entities or persons affiliated with Client reasonably required in connection with the enforcement of the Patent Rights; (3) cooperate with the Firm in the prosecution of any Lawsuit; (4) appear on reasonable notice, any and all depositions and court appearances at which Client's attendance is required or ordered; (5) comply with all reasonable requests of Firm in connection with the preparation and presentation of any Lawsuit; (6) provide on-going technical and

FRESH
Confidential Attorney-Client Privilege

administrative assistance, including, as non-limiting examples, the preparation of Rule 11 charts and review of documents and analysis of invalidity contentions. Firm agrees to make reasonable efforts to keep Client informed as to the status of all Lawsuits. The Parties agree to execute such other documents as might be reasonably necessary or appropriate to consummate and implement the terms of this Agreement.

6.    **Client Payment of Enforcement Expenses**.

Client agrees to pay (within 10 business days) all expenses reasonably incurred in connection with the enforcement of the Client Patents ("*Litigation Expenses*"). Firm or Client will be reimbursed for all Litigation Expenses prior to distribution of the Net Cash Sum (as defined below) regardless of whether the Litigation Expenses were incurred for the Infringer(s) corresponding to the Gross Cash Sum (as defined below). Litigation Expenses include court filing fees, service costs, outside litigation support services, deposition and discovery expenses, investigation costs, expert witness fees, travel and other incidental expenses in connection with the Lawsuit, local counsel costs and fees, Client office space rent solely related to Lawsuit – for example, a "war room" for trial, or conference room for witness depositions, and not for establishing or operating a regular place of business – patent maintenance fees, travel expenses, long distance calls, investigation fees, expert and witness fees, electronic imaging, review, processing and hosting of documents (including providing document review and search capabilities), charts, photographs, deposition fees and costs, court costs, photocopying and other document reproduction costs, postage charges, fax charges, on-line computer research (only if approved by Client prior to incurring), consulting costs, due diligence costs, local counsel costs and fees, financing costs to the extent applicable, and other expenses reasonably incurred in connection with the enforcement of the Client Patents or other Patent Rights.

Litigation Expenses exceeding $500 (*e.g.*, deposition and hearing transcripts, and expert witness and consultant fees) will ordinarily be billed directly to the Client by the vendor providing those services. Firm will obtain written pre-approval from the Client for any Litigation Expense expected to exceed $500. Firm will exercise its reasonable judgment and best efforts to limit the Litigation Expenses to only those expenses that it considers appropriate and necessary under the circumstances.

In order to commence the Lawsuit related to each Infringer, Client shall pay a retainer of no less than $800 (the "Retainer") to the Firm in order to cover an initial filing and process service fees as to each discrete Lawsuit. Firm may, at its discretion, apply the Retainer to pay Litigation Expenses incurred by the Client during this Agreement, but Client will be required to pay Invoices (as defined below) submitted by Firm, regardless of whether the Retainer is available to pay those Invoices. Upon the conclusion or termination of this Agreement, Firm will apply the Retainer to any outstanding Litigation Expenses owed by Client to Firm for Litigation Expenses, and will refund any balance of the Retainer to Client, if any.

FRESH
Confidential Attorney-Client Privilege

For purposes of clarity, any outstanding Litigation Expenses shall be first reimbursed from the Gross Cash Sum for any Infringer, regardless of whether the Litigation Expenses were incurred for the Infringer directly corresponding to the recovery.

Firm shall prepare periodic invoices (*"Invoices"*) and each Invoice shall reflect the Litigation Expenses incurred and owed by Client for the time period covered by the respective Invoice. Firm shall deliver invoices to the Client. Client shall pay Firm in readily available funds (*"Payment"*) within thirty (30) days of Client's receipt of an Invoice from Firm.

7. **Compensation to Firm.**

Client has requested Firm and Firm has agreed to handle litigation activities under this Agreement on a contingent fee basis. In other words, Firm's fee will depend upon whether Client recovers any sum (*"Gross Cash Sum"*) by way of licensing, settlement, trial or otherwise – solely with respect to the Client Patents or Patent Rights, and solely with respect to the Infringer(s). Gross Cash Sum shall be limited to the sums actually paid by Infringer(s) that result from Firm's efforts. As an example, foreign withholding may reduce the amount that is actually received by Client to something less than the Gross Cash Sum. The term *"Net Cash Sum"* refers to any sums by way of licensing, settlement, trial or otherwise – with respect to the Client Patents or Patent Rights, and solely with respect to the Infringer(s) – after reimbursement, to the Firm or Client, of Litigation Expenses. The Firm has advised Client that Firm is willing to charge for its services based on the time spent and the regular hourly rates of each attorney and legal assistant performing services to a client regardless of the outcome. Client has chosen to retain Firm to represent Client on a contingency fee basis in lieu of an hourly rate representation. Accordingly, Firm's fees will be based upon the following contingent fee terms.

The contingent fee for the Firm's services charged in connection with the handling by Firm of any matters under this Agreement will be, with respect to Net Cash Sum received from any Infringer as a result of any licenses, negotiations, settlement, sales, assignments, transfers or judgments that involve the Client Patents, in whole or in part, and that result from Firm's efforts.

- Twenty percent (20%) of the Net Cash Sum received from an accused Infringer prior to the scheduling conference in the Lawsuit naming the accused Infringer;

- Twenty-two and a half percent (22.5%) of the Net Cash Sum received from an accused Infringer after the scheduling conference and before filing of the first claim construction brief, or commencement of substantive discovery, whichever occurs first;

- Twenty-five percent (25%) of the Net Cash Sum received from an accused Infringer after the filing of the first claim construction brief ;

- Thirty percent (30%) of the Net Cash Sum received from an accused Infringer after the claim construction hearing;

FRESH
Confidential Attorney-Client Privilege

• Thirty-five percent (35%) of the Net Cash Sum received from an accused infringer after the start of the pre-trial conference and through appeal of the Lawsuit naming the accused infringer; and

• If Net Cash Sum is received under an agreement with a Patent Aggregator, which shall mean an entity that derived 50% or more of its revenue in the fiscal year preceding execution of a license or other agreement with such entity (including, by way of example, RPX Corporation), and the agreement with the Patent Aggregator results in a license and dismissal to an Infringer in a Lawsuit naming the accused Infringer, the contingency fee to the Firm shall be calculated to be the same as if the Net Cash Sum had been received from the accused infringer. If the agreement with the Patent Aggregator results in a license to multiple Infringers in Lawsuits naming those accused Infringers, the contingency fee to the Firm shall be calculated as the weighted average of the contingency fees otherwise due to Firm for the multiple Infringers in Lawsuits naming the accused infringers. For purposes of clarity, if an agreement with the Patent Aggregator results in the license and dismissal of three defendants, one defendant at a 20% rate, another defendant at a 25% rate, and another defendant at a 30% rate, the Firm's contingency fee for the agreement with the Patent Aggregator shall be 25%. If there is an agreement with the Patent Aggregator and it results in the settlement of multiple cases that are handled by separate lead counsel, each firm shall receive compensation based upon the percentage of cases such firm is representing as lead counsel. For example, if there is an RPX deal which results in a Net Cash Sum of $100,000 and requires the dismissal of 10 defendants and Firm is lead counsel against 9 of those defendants, then Firm is entitled to apply its compensation model to 90% of the proceeds. Firm's compensation assuming the 25% stage would be .25($90,000) = $22,500.

Firm shall have the right, in its sole discretion, to determine whether it will handle any appeal from any judgment in a Lawsuit against an Infringer.

Firm is expressly authorized to apply to the Court in any Lawsuit for the maximum amount of compensation, costs and expenses allowed to Client by law ("***Attorneys' Fees and Costs***"). Any Attorneys' Fees and Costs recovered under this paragraph shall be added to the Net Cash Sum under this Agreement.

All Contingent Attorneys' Fees shall be consistent with the Texas Rules of Professional Conduct and any other applicable rules. Should any fees be found by a court of competent jurisdiction to be inconsistent with any applicable rules of ethics, the Parties agree that the attorneys' fees due under this Agreement shall not be waived, but shall be restructured so that they are consistent with such rules of ethics.

FRESH
Confidential Attorney-Client Privilege

Any Gross Cash Sums received from an Infringer will be held in Firm's client trust account. The Client's portion shall be distributed within ten business days after receipt of the Gross Cash Sums from an Infringer.

Firm will have a preferred lien for Firm's fees and Litigation Expenses with respect to the matters which are the subject of this Agreement, and on all proceeds of any recovery obtained whether by settlement, arbitration award, or court judgment or on any property obtained, including by patent, trademark, copyright, rescission, specific performance or other means. This generally means that Firm has an ownership interest in any recovery by Client to the extent of Firm's unpaid fees and Litigation Expenses.

8.  **Local Counsel**.

This Agreement confirms that Client has agreed to retain local counsel, if necessary, in the United States District Court where any Lawsuit is filed, as selected by Client. Client will execute a separate Legal Service Agreement with such local counsel, which will formally set forth the terms and conditions pursuant to which the local counsel will act on behalf of Client. The local counsel would receive fees separate from the Firm's percentage of the Net Cash Sum, as negotiated with Client.

9.  **Defense of Declaratory Judgments Involving Patent Rights**.

Firm shall defend any declaratory judgment of patent noninfringement, invalidity, unenforceability, or other compulsory counterclaim relating to the Client Patents or the Patent Rights (hereinafter a "*Compulsory Counterclaim*") that is asserted against Client by any party who solely was the subject of any licensing negotiations or Lawsuit involving the Client Patents or the Patent Rights, at no extra charge to Client.

10.  **Defense of Other Claims & Counterclaims**.

Should any party to a Lawsuit enforcing the Client Patents or Patent Rights against that party assert a claim or counterclaim against Client other than a Compulsory Counterclaim (hereinafter a "*Permissive Counterclaim*"), and if Client desires Firm to defend it against such a claim, then Client agrees to compensate Firm for reasonable attorneys' fees for providing such services on an hourly fee basis in accordance with its standard hourly rates in effect at the time such legal services are performed. Firm's billing policies, attached hereto, shall be applicable to the legal services performed by Firm in the defense of such claims or counterclaims. Alternatively, Client may, at its option, retain other counsel to handle the defense of such claims or counterclaims.

11.  **Proceedings Before the Patent and Trademark Office**.

FRESH
Confidential Attorney-Client Privilege

In the event that the Client Patents or Patent Rights become subject to any action through the United States Patent Office ("USPTO"), including inter partes review or a request for reexamination, Firm will not represent Client as lead counsel in those matters before the USPTO, and Client will retain competent lead patent counsel to represent it in such matters. However, Firm may represent Client as co-counsel and/or in support of other lead counsel, to the extent it is ethically acceptable and allowable by law, rule, or court order, in any inter partes review proceeding of the Client Patents or Patent Rights.

12.   **Commencement of Representation.**

The Firm's formal representation of Client commences as soon as we have received a signed copy of this Agreement. In addition, Client agrees we may perform any due diligence we deem appropriate regarding Client's matters at any time.

13.   **Termination of Representation.**

Client may at any time terminate Firm's representation of Client pursuant to this Agreement. Such termination without cause shall not in any way eliminate or reduce Firm's right to compensation relating to any Net Cash Sums or Costs pending as of the date of termination under this Agreement and the applicable common law. In the event Client discharges Firm for good cause, however, Firm shall not be entitled to receive any fee or other compensation except for any Net Cash Sums owed to Firm as of the date of termination and reimbursement to Firm of Costs incurred through the date that Firm ceases to render services to Client, which shall be reimbursed solely from Gross Cash Sums recovered by Client, if any.

The Firm may withdraw from representing Client as allowed by the Texas rules of ethics for lawyers, for reasons including failure to timely pay fees, expenses (including outside vendor expenses), and/or any retainers in connection with the representation. Before the Firm withdraws from its representation of Client, the Firm will give Client written notice.

14.   **Law Firm Liability after Termination.**

If Firm ceases to represent Client pursuant to any provision of this Agreement, then Firm shall no longer be liable to Client or to any third party for any costs or expenses incurred after the date of the termination of Firm's representation.

15.   **No Guarantee of Outcomes, Estimated Fees, Expenses.**

The Firm uses diligent efforts in representing Client in these matters; however, the Firm is unable to give and has given no guarantees as to any outcome(s). Based on information available at the time, the Firm may provide opinions on likelihood of success; strategy to be pursued or

FRESH
Confidential Attorney-Client Privilege

estimated fees and costs. These statements of opinion are not guarantees, representations, warranties, or promises.

16.   **Law Firm Association of Other Lawyers or Assignment**.

Firm agrees to perform faithfully the duties imposed upon Firm as attorneys for Client in the enforcement of the Client Patents and Patent Rights. Firm may, at the discretion and expense of Firm, associate any other attorney, law firm or other entity, as allowed by law, in the enforcement of the Client Patents and Patent Rights, and may assign all or any part of its interest in the Net Cash Sums to any other such entity, as allowed by law, provided that such assignment shall not increase the cost to Client of any Lawsuit or reduce the interest of Client in the Net Cash Sums. Firm shall also have the right to assign its interest in the Net Cash Sums, as allowed by law, to any other entity, provided that such assignment shall not relieve Firm of any obligation under this Agreement. Client agrees to cooperate with Firm in apportioning Firm's portion of revenues among other professionals who may further the purposes of this Agreement.

17.   **Conflicts**.

It is possible that some of Firm's present or future clients will have matters adverse to Client or Client's organization while Firm is representing Client. Firm understands that Client has no objection to Firm's representation of parties with interests adverse to Client's and Client waives any actual or potential conflict of interest as long as those other engagements are not substantially related to Firm's services to Client. By agreeing to this waiver of any claim of conflicts as to matters unrelated to the subject matter of Firm's services to Client, Client also agrees that Firm is not obliged to notify Client when Firm undertakes any such representation.

Similarly, new lawyers may join Firm.  These lawyers may have represented parties adverse to Client while employed by other law firms or organizations.  Firm assumes, consistent with applicable ethical standards, that Client has no objection to Firm's continuing representation of Client notwithstanding Firm's new lawyers' prior professional relationships.

Firm agrees, however, that Client's consent to, and waiver of, such representation shall not apply in any instance where, as a result of Firm's representation of Client, Firm have obtained proprietary or other confidential information of a non-public nature, that, if known to such other client, could be used in any such other matter by such client to Client's material disadvantage or potential material disadvantage.

This will also confirm the Parties understanding that, unless the Parties reach an explicit understanding to the contrary, Firm is being engaged by, and will represent only Client, and no

FRESH
Confidential Attorney-Client Privilege

**ENGAGEMENT LETTER FOR CONTINGENT FEE PATENT LITIGATION**
PAGE 9

other entity or person in connection with Licensing Negotiations and Lawsuit, unless agreed to by Firm in writing.

18.     **Dispute Resolution.**

In the event that there is a dispute concerning the terms of this Agreement or involving any of the services provided pursuant to this Agreement, the Parties hereby agree to submit such dispute to confidential binding arbitration. The Parties shall choose a single arbitrator to arbitrate the dispute who shall conduct the proceedings at a location agreed to by both Parties pursuant to the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), as applicable, then in effect or any other procedure mutually agreed to. Each party shall bear its own attorney fees and costs in connection with the arbitration, including the costs of the AAA and the arbitrator, which shall be equally divided.  In the event that this arbitration provision is deemed to be unenforceable, such unenforceability shall have no effect on any other provision of this Agreement, and the Parties in such event shall be free to pursue any remedies otherwise available.

19.     **Remedies for Breach.**

In the event that any Party hereto shall breach any of the obligations imposed by this Agreement, then a non-breaching Party shall be entitled to pursue a claim for monetary damages as a result of such breach.  No Party, however, shall be entitled to recover special, indirect, or consequential damages, including lost profits, from any other Party. For purposes of this paragraph, if Client breaches the Agreement, the compensation to which Firm may be entitled under Paragraph 7 herein is not "special, indirect, or consequential damages, including lost profits."

20.     **Attorneys' Fees in Dispute.**

In the event that a Party becomes involved in litigation in connection with any right, obligation, or duty set forth in this Agreement then, and in that event, each Party shall be responsible for paying its own expenses, costs and attorneys' fees incurred by such Party as a result of such litigation.

21.     **Successors and Assigns.**

This Agreement is and shall be binding and inure to the benefit of the Parties and their respective subsidiaries and affiliates, heirs, executors, administrators, and legal representatives.

22.     **Governing Law.**

It is expressly understood and agreed that this Agreement shall be governed by, construed, interpreted, and enforced in accordance with the laws of the State of Texas

23.     **Legal Construction.**

FRESH
Confidential Attorney-Client Privilege

In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions thereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

24.    **Waiver and Integration**.

This Agreement constitutes the entire agreement among the Parties and supersedes any prior understandings or written or oral agreement between the Parties respecting the subject matter of this Agreement. This Agreement may not be modified or amended except by a subsequent agreement in writing signed by the Parties. The Parties may waive any of the conditions contained herein or any of the obligations of any other party. Any such waiver shall be effective only if in writing and signed by the Party waiving such condition or obligation.

25.    **Texas Lawyer's Creed**.

The Texas Supreme Court has adopted the Texas Lawyer's Creed which sets forth standards for attorney professionalism and states lawyers should advise their clients of its contents when    undertaking    representation.    This    document    can    be    found    at http://www.txcourts.gov/media/276685/texaslawyerscreed.pdf.

26.    **NOTICE TO CLIENTS**.

**The State Bar of Texas investigates and prosecutes professional misconduct committed by Texas attorneys. Although not every complaint against or dispute with a lawyer involves professional misconduct, the State Bar Office of the General Counsel will provide you with information about how to file a complaint. For more information, please call 1-800-932-1900. This is a toll-free phone call.**

27.    **Required Special Disclosures**.

(a)    CLIENT ACKNOWLEDGES THAT IT WAS ADVISED TO RETAIN INDEPENDENT LEGAL COUNSEL TO REPRESENT CLIENT IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THIS AGREEMENT, AND WITH RESPECT TO THE ARBITRATION CLAUSE ABOVE. CLIENT FURTHER ACKNOWLEDGES THAT IT WAS ADVISED THAT FIRM HAS A CONFLICT OF INTEREST THAT PREVENTS IT FROM REPRESENTING CLIENT IN ANY WAY WITH RESPECT TO THE NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT FIRM HAS NOT DONE SO.

(b)    Client acknowledges that prior to signing this Agreement, Client was given the option of retaining Firm to handle the Lawsuit on the basis of a normal hourly rate (plus costs and

**BACKERTOP0010**                                                    **FRESH**

Confidential Attorney-Client Privilege

ENGAGEMENT LETTER FOR CONTINGENT FEE PATENT LITIGATION
PAGE 11

expenses incurred) but elected instead to retain Firm pursuant to the terms and conditions of this Agreement. Client retains the right to convert this Agreement to an hourly fee agreement for any new litigation filed subsequent to the recovery of fees.

(c)     Client acknowledges that it has been advised that submission to binding arbitration typically results in the waiver of significant rights, including the waiver of the right to file a lawsuit in a different venue, waiver of the right to a jury trial, the possible waiver of broad discovery, and the loss of the right to appeal.

28.     **Counterparts.**

This Agreement may be executed in multiple counterparts, each one of which will be considered to be an original.

29.     **Representation of Authority.**

The undersigned represents that he or she has full authority to enter into this Agreement on behalf of Client.

FRESH IP, PLC

By: _____
        Ronald Burns, Counsel


AGREED:

CLIENT NAME:    BACKERTOP LICENSING LLC

By: _____

Name:    Lori LaPray

Title:    Managing Member

FRESH
Confidential Attorney-Client Privilege

**ENGAGEMENT LETTER FOR CONTINGENT FEE PATENT LITIGATION**
**PAGE 12**


**<u>Exhibit A</u>**


US9332385B1

US9654617B2

US10477011B2

US10728382B2

FRESH
Confidential Attorney-Client Privilege

**Subject:** FW: 2022-10-13 Correspondence re Backertop Licensing LLC v. August Home, Inc.
**From:** Ronald Burns <ron@freship.com>
**To:** Brandon LaPray <brandon@ip-edge.com>,Papool Chaudhari <papool@pralawllc.com>
**Cc:** "chong@chonglawfirm.com" <chong@chonglawfirm.com>, "patent@chonglawfirm.com" <patent@chonglawfirm.com>, "linhd@ip-edge.com"
<linhd@ip-edge.com>, Danae Maher <dmaher@ip-edge.com>
**Date Sent:** Thursday, October 13, 2022 12:27:30 PM GMT-06:00
**Date Received:** Thursday, October 13, 2022 12:27:42 PM GMT-06:00
**Attachments:** 2022-10-13 Letter from August Home to Backertop re Attorneys Fees and Costs.pdf

Brandon,

Just received this gem.

Please advise as to how you would like to respond.

Thanks,
Ron

**Ronald Burns | Counsel**
**Registered Patent Attorney, Trademark Attorney**

**FRESH**

a: FRESH IP PLC | 5999 Custer Road, Suite 110-507
Frisco, TX 75035 | USA
e: ron@freship.com | w:www.freship.com
Direct: 972-632-9009

**From:** Teneshia Brown <TBrown@fr.com>
**Date:** Thursday, October 13, 2022 at 1:21 PM
**To:** Ronald Burns <ron@freship.com>
**Cc:** "chong@chonglawfirm.com" <chong@chonglawfirm.com>
**Subject:** 2022-10-13 Correspondence re Backertop Licensing LLC v. August Home, Inc.

Counsel:

Attached, please find correspondence and the accompanying attachments from Ricardo Bonilla regarding the above matter.  Please do not hesitate
to contact me should you have any issues accessing the files.

Regards,

**Teneshia Brown** :: Fish & Richardson P.C.
Washington DC
+1-202-626-7737 direct :: TBrown@fr.com
fr.com :: Bio :: LinkedIn :: Twitter

**************************************************************************************************************
This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged
information. Any unauthorized use or disclosure is prohibited. If you are not the intended recipient, please contact the
sender by reply email and destroy all copies of the original message.
**************************************************************************************************************

EXHIBIT

O 5

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege


FISH & RICHARDSON

October 13, 2022

Fish & Richardson P.C.
1717 Main Street
Suite 5000
Dallas, TX 75201

214 747 5070 main
214 747 2091 fax

**VIA E-MAIL**

Ronald W. Burns
Fresh IP, PLC
5999 Custer Road,
Suite 110-507
Frisco, Texas 75035
ron@freship.com

Ricardo J. Bonilla
Principal
rbonilla@fr.com
+1 214 292 4012 direct

Re:     *Backertop Licensing LLC v. August Home, Inc.*
        Case No. 1:22-cv-00573-CFC (D. Del.)

        Request for Attorneys' Fees and Costs

Counsel:

    We write on behalf of Defendant August Home, Inc., to demand that Backertop Licensing LLC reimburse August Home's attorneys fee and costs in the above-referenced action, which Backertop voluntarily dismissed without prejudice in the face of August Home's invalidity defenses.

    As August Home explained to Backertop on multiple occasions, the instrumentalities Backertop accused of infringement predate the priority date of the asserted U.S. Patent No. 9,332,385.[1] "A century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier.'" *Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) (citations omitted); *accord Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889) ("That which infringes, if later, would anticipate, if earlier.").

    Even though Backertop has now voluntarily dismissed the above-referenced action, it did so only after wasting the Court's and August Home's time, money, and resources on claims that were doomed from the start. As such, it is within reason and the law that August Home demands that Backertop reimburse August Home's attorneys fees and costs. If not, August Home may proceed with filing a declaratory judgment action to continue its pursuit of the invalidity defenses it raised during the litigation and to seek further relief via § 285; this would highlight August Home's invalidating prior art references on the public docket, alerting any current or future targets of Backertop's campaign to the dispositive invalidating prior art and arguments August Home will raise.

---

[1] Backertop's Original Complaint asserted infringement of three patents: the '385 Patent, and U.S. Patent Nos. 9,654,617 and 10,728,382. (*See* D.I. 1 at ¶¶ 7, 33, 49; Prayer for Relief.) But in its opposition to August Home's motion to dismiss, Backertop contended "[t]here is only one patent in suit," the '385 Patent. (D.I. 16 at 4.) August Home will take Backertop at its word and limit its discussion herein to the lone asserted patent—the '385 Patent.

fr.com

**BACKERTOP0150**
Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege



FISH&RICHARDSON

Ronald W. Burns
July 15, 2022
Page 2

### August Home is Entitled to Attorneys' Fees and Cost Under 35 U.S.C. § 285

Under the fee-shifting provision applicable to patent cases, 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "Section 285 was enacted to address a patent-specific policy rationale, awarding fees in exceptional cases in which sanctions were necessary to deter the improper bringing of clearly unwarranted suits." *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1372 (Fed. Cir. 2012) (internal quotation marks omitted). In *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, the Supreme Court clarified the standard for evaluating whether a case is exceptional. 134 S. Ct. 1749, 1751 (2014).

An exceptional case warranting attorneys' fees is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) *or* the unreasonable manner in which the case was litigated." *Octane Fitness*, 134 S. Ct. at 1751 (emphasis added). District courts are to "determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* The Supreme Court explicitly rejected the strict standard that had been previously employed by the Federal Circuit, which required showing both subjective bad faith and objective baselessness. *Id.* at 1758. The Supreme Court also relaxed the burden for demonstrating entitlement to fees, requiring that it be shown only by a preponderance of the evidence. *Id.*

This case was an exceptional case warranting attorneys' fee and cost under § 285 because upon Backertop's filing of the above-referenced action, August Home continuously cautioned Backertop of the substantive weakness of its litigation position, as shown below. August Home explained to Backertop that the instrumentalities accused of infringement predated Backertop's asserted patent, and August Home's patent covering the August Home system predated the asserted patent. August Home also filed—and the parties fully briefed—a motion to dismiss because the asserted patent was invalid as directed to ineligible subject matter under § 101. Courts have held that the assertion of an objectively-invalid patent is grounds for a finding of an exceptional case, including on two occasions on behalf of our clients. *See, e.g., Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, No. 876 F.3d 1372, 1380 (Fed. Cir. 2017) (affirming lower court's finding of exceptionality where patentee pursued claims of infringement over objectively invalid patent under § 101); *eDekka LLC v. 3Balls.com, Inc.*, No. 2:15-cv-541, 2015 WL 9225038 (E.D. Tex. Dec. 17, 2015) (awarding attorneys' fees where patentee's § 101 position was objectively unreasonable). We expect to obtain the same result should August Home have to proceed to litigation here.

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege


**FISH**
FISH & RICHARDSON

Ronald W. Burns
July 15, 2022
Page 3

### <u>The Instrumentalities Accused of Infringement Predate Backertop's Asserted Patent</u>

#### The Law of 35 U.S.C. § 102

A person is not entitled to a patent if "(1) the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention; or (2) the claimed invention was described in a patent issued under section 151, or in an application for patent published or deemed published under section 122(b), in which the patent or application, as the case may be, names another inventor and was effectively filed before the effective filing date of the claimed invention." 35 U.S.C § 102(a) (2012). In 2011, Congress passed the Leahy–Smith America Invents Act ("AIA"), Pub. L. No. 112–29, 125 Stat. 284 (2011), converting the patent system from "first-to-invent" to "first-inventor-to-file," giving priority to the person who was first to file a provisional or non-provisional patent application. *Storer v. Clark*, 860 F.3d 1340, 1342 (Fed. Cir. 2017). The first-to-file provision of the AIA became effective on applications filed on or after March 16, 2013. *See Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1357 n.2 (Fed. Cir. 2018); MPEP § 2159.02.

"[P]ublic accessibility has been called the touchstone in determining whether a reference constitutes a printed publication . . . ." *VidStream LLC v. Twitter, Inc.*, 981 F.3d 1060, 1065 (Fed. Cir. 2020) (quoting *In re Hall*, 781 F.2d 897, 899 (Fed. Cir. 1986)). "A reference will be considered publicly accessible if it was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence[] can locate it." *Id.* (alteration in original). "A bar under [the public use prong of § 102(a)(1)] arises where, before the critical date, the claimed invention was in public use and ready for patenting." *Pronova Biopharma Norge AS v. Teva Pharms. USA, Inc.*, 549 F. App'x 934, 938 (Fed. Cir. 2013). In this context, "public use" means that purported use "(1) was accessible to the public; or (2) was commercially exploited." *Id.*

All that is required for a purported invention to be "on sale" within the meaning of the statute is that the claimed invention is "the subject of a commercial offer for sale and ready for patenting." *Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*, 139 S. Ct. 628, 630 (2019) (quoting *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998) (internal quotations omitted)). Readiness for patenting can be shown "by proof of reduction to practice" or "drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention.'" *Pfaff*, 525 U.S. at 67–68.

The Federal Circuit recognizes that "[w]hen an accused product and the prior art are closely aligned, it takes exceptional linguistic dexterity to simultaneously establish infringement and evade invalidity." *01 Communique Lab., Inc. v. Citrix Sys., Inc.*, 889 F.3d 735, 742–43 (Fed. Cir. 2018) (citations omitted). "Where an accused infringer is clearly practicing only that which was in the prior art, and nothing more, and the patentee's proffered construction reads on the accused device, meeting [the] burden of [establishing invalidity] should not prove difficult." *Tate Access Floors v.*



Ronald W. Burns
July 15, 2022
Page 4

*Interface Architectural Res.*, 279 F.3d 1357, 1367 (Fed. Cir. 2002).

**Analysis**

Backertop accused August Home's Smart Lock and Connect products and systems, and the August Home App, of infringing the '385 Patent. These products, however, do not infringe and have not infringed—directly or indirectly—the asserted claims of the patent-in-suit. But if Backertop is right, and the accused instrumentalities do infringe, these instrumentalities invalidate the '385 Patent because August Home's instrumentalities predate the February 13, 2015 priority date of the '385 Patent.

In its Complaint, Backertop used the following statements about August Home's instrumentalities to accuse August Home of infringing the asserted patent:

- "The Defendant's Infringing Instrumentalities operate based upon wireless communication between a mobile device (*e.g.*, user's mobile device with the August Home App installed) and at least one beacon (*e.g.*, August Smart Lock)." Compl. ¶ 10, 11.

- "The Defendant's Infringing Instrumentalities identify a present physical location of such a mobile device." *Id.* ¶ 12.

- "The Defendant's infringing instrumentalities operate such that when a user's mobile device enabled with the August Home App is located at or near to its home, an August lock establishes a wireless connection with the mobile device." *Id.* ¶ 13.

- "The Defendant's infringing instrumentalities operate such that the August lock communicates via wireless connection messages with the mobile device." *Id.* ¶ 14.

- "The Defendant's infringing instrumentalities operate such that, when a user's mobile device is within range of the August lock, home mode is engaged and auto-unlock is disengaged." *Id.* ¶ 15.

- "The Defendant's infringing instrumentalities operate such that, when a user's mobile device is out of range of the August lock, home mode is disengaged and auto-unlock is engaged." *Id.* ¶ 16.

- "The Defendant's infringing instrumentalities retrieve location specific rules and retrieve user profile data from the mobile device." *Id.* ¶ 17.

- "The Defendant's infringing instrumentalities present content on the mobile device—via the August Home App—based upon the location specific rules and user profile data." *Id.* ¶ 18.

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege



**FISH**
FISH & RICHARDSON

Ronald W. Burns
July 15, 2022
Page 5

Further, the Complaint stated, "All recited element of—at least—claims 1 and 8 of the '385 Patent are present within the structure and/or operation of [August Home's] infringing instrumentalities." *Id.* ¶ 20. All these accused August Home instrumentalities, however, predate the February 13, 2015 priority date of the '385 Patent. For example, the following snippet was taken from a December 27, 2014 iOS customer review from the August Home product launch:

> Works as advertised, but could be improved. 5
> Reply
> by Michelle_eris – Dec 27, 2014
> I gave it five stars, but if 4.5 were available, that's what I would give it. Initially I had a problem in that it wouldn't unlock the door because it wasn't strong enough to work the mechanism. I fixed that by applying powdered graphite to the lock's (not the August's) innards. Powdered graphite is the generally accepted lubricant for lock mechanisms. The only complaint I have is mild; the geofence is too wide. I have to go too far from my house for August to unlock the door. If I walk to my mailbox (which is around the corner and down the street a bit), and walk back, the door remains locked and I have to use a key or manually unlock it with the app. It would be nice if the user could set the distance. (I could change the timing of everlock so the door doesn't lock while I'm checking the mail, but I'd rather keep it short so that when I go somewhere, the door doesn't remain unlocked for long.)
> Version 1.3.12 United States

AHI_BL-007. This snippet encapsulates the fact that prior to February 13, 2015, August Home's instrumentalities: "operate[d] based upon wireless communication between a mobile device (*e.g.*, user's mobile device with the August Home App installed) and at least one beacon (*e.g.*, August Smart Lock)"; "identif[ied] a present physical location of such a mobile device"; "operate[d] such that when a user's mobile device enabled with the August Home App is located at or near to its home, an August lock establishes a wireless connection with the mobile device"; "operate[d] such that the August lock communicates via wireless connection messages with the mobile device"; "operate[d] such that, when a user's mobile device is within range of the August lock, home mode is engaged and auto-unlock is disengaged"; "operate[d] such that, when a user's mobile device is out of range of the August lock, home mode is disengaged and auto-unlock is engaged"; "retrieve[d] location specific rules and retrieve user profile data from the mobile device"; and "present[ed] content on the mobile device—via the August Home App—based upon the location specific rules and user profile data." That is, the functionalities Backertop accuses of infringement were present in August Home's systems as of the date of this posting.



**FISH**
FISH & RICHARDSON

Ronald W. Burns
July 15, 2022
Page 6

Additionally, the following snippet was taken from a January 31, 2015 iOS customer review from the August Home product launch:

> Awesome Piece of Kit. 3
> Reply
> by SoCal_Ryan – Jan 31, 2015
> Easy Install. Works like a charm when using the app to lock and unlock. The "ever-lock" feature, which automatically locks your door for you after you open it, works great. Although, there is a nano second delay for the auto-unlock feature when it is working. You have to get next to the door, not within vicinity. However sometimes the auto-unlock feature doesn't work at all. A couple of times I'll stand next to my door hoping it'll unlock (even when not logged into the app, it says it'll still work & will ask you during setup if you want to scan when the app is off), but it doesn't transmit the Bluetooth signal on the other side of the door and I'll have to take my phone out and use the app to unlock the door. This is frustrating because the app scans for your lock, it doesn't do it instantly either, it takes about 5-20 seconds trying to pair with the lock so you can unlock it. For the most part it works as advertised. August just needs to work on the auto-unlock feature within the app so that it works seamlessly, also the whole scanning to

AHI_BL-006. This snippet encapsulates the fact that prior to February 13, 2015, August Home's instrumentalities: "operate[d] based upon wireless communication between a mobile device (*e.g.*, user's mobile device with the August Home App installed) and at least one beacon (*e.g.*, August Smart Lock)"; "identif[ied] a present physical location of such a mobile device"; "operate[d] such that when a user's mobile device enabled with the August Home App is located at or near to its home, an August lock establishes a wireless connection with the mobile device"; "operate[d] such that the August lock communicates via wireless connection messages with the mobile device"; "operate[d] such that, when a user's mobile device is within range of the August lock, home mode is engaged and auto-unlock is disengaged"; "operate[d] such that, when a user's mobile device is out of range of the August lock, home mode is disengaged and auto-unlock is engaged"; "retrieve[d] location specific rules and retrieve user profile data from the mobile device"; and "present[ed] content on the mobile device—via the August Home App—based upon the location specific rules and user profile data."

Additionally, the following snippet was taken from a November 8, 2014 iOS customer review from the August Home product launch:

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege


FISH&RICHARDSON

Ronald W. Burns
July 15, 2022
Page 7

> Great so far. 4
> Reply
> by Michael Gibson – Nov 8, 2014
> I backed pretty much all of the smart lock campaigns back when they
> started and I've been trying them each out as they finally ship. Before I
> got my August Smart Lock, I used the Danalock and the Lockitron.
> August was by far the quickest and easiest to set up. I didn't have to
> waste any time attempting to re-align the plate, it just worked on the
> first try. The app has also been the much more stable so far than the
> ones offered for the other locks. The time it takes to connect to the
> lock from inside the app is a bit on the slow side, but Auto-Unlock has
> been working flawlessly so my door is always unlocked by the time I
> get to it without having to open the app. I hope in future versions they
> allow you to tweak certain settings, like the Everlock timer and the
> geofence radius, but it's still been far better than the other locks I have
> used. I do miss remote access, which I had with Lockitron through Wi-
> fi and the Danalock through Z-Wave, but the increased battery life
> seems like a decent trade-off. I know The Harmony Hub from Logitech
> will be supporting the August Lock early next year, so I expect I will be
> able to remotely unlock my door through the Harmony app when that
> happens. Eventually HomeKit should make it even easier, but time will
> tell.
> Version 1.1.8 United States 1 of 2 viewers found this review helpful

AHI_BL-008. This snippet encapsulates the fact that prior to February 13, 2015, August Home's instrumentalities: "operate[d] based upon wireless communication between a mobile device (e.g., user's mobile device with the August Home App installed) and at least one beacon (e.g., August Smart Lock)"; "identif[ied] a present physical location of such a mobile device"; "operate[d] such that when a user's mobile device enabled with the August Home App is located at or near to its home, an August lock establishes a wireless connection with the mobile device"; "operate[d] such that the August lock communicates via wireless connection messages with the mobile device"; "operate[d] such that, when a user's mobile device is within range of the August lock, home mode is engaged and auto-unlock is disengaged"; "operate[d] such that, when a user's mobile device is out of range of the August lock, home mode is disengaged and auto-unlock is engaged"; "retrieve[d] location specific rules and retrieve user profile data from the mobile device"; and "present[ed] content on the mobile device—via the August Home App—based upon the location specific rules and user profile data."

The August Home system was on sale or otherwise know to the public at least, as early as October 10, 2014, which is well before the February 13, 2015 priority date of the asserted patent. Enclosed are 19 different documents, each containing several examples similar to the three snippets

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege



**FISH.**
FISH & RICHARDSON

Ronald W. Burns
July 15, 2022
Page 8

highlighted above, showing that the August Home system was on sale or otherwise know to the public well before the February 13, 2015 priority date of the asserted patent: AHI_BL-001 (describing public use of the August Home system, as early as October 10, 2014); AHI_BL-002 (describing public use of the August Home system, as early as July 30, 2015); AHI_BL-003 (describing public use of the August Home system, as early as June 4, 2015); AHI_BL-004 (describing public use of the August Home system, as early as May 9 10, 2015); AHI_BL-005 (describing public use of the August Home system, as early as April 5, 2015); AHI_BL-006 (describing public use of the August Home system, as early as January 9, 2015); AHI_BL-007 (describing public use of the August Home system, as early as December 2, 2014); AHI_BL-008 (describing public use of the August Home system, as early as November 3, 2014); AHI_BL-009 (describing public use of the August Home system, as early as October 27, 2014); AHI_BL-011 (describing public use of the August Home system, as early as October 15, 2014); AHI_BL-012 (describing public use of the August Home system, as early as October 14, 2014); AHI_BL-013 (describing sale of the August Home system, as early as August 2014); AHI_BL-014 (describing sale of the August Home system, as early as November 26, 2014); AHI_BL-015 (describing sale and public use of the August Home system, as early as December 1, 2014); AHI_BL-016 (describing sale and public use of the August Home system, as early as October 16, 2014); AHI_BL-017 (describing sale and public use of the August Home system, as early as October 14, 2014); AHI_BL-018 (displaying a commercial instruction sheet for public use of the August Home system, as early as August 2014); AHI_BL-019 (describing sale and public use of the August Home system, as early as October 14, 2014); AHI_BL-021 (printed publication of Intelligent Door Lock System With Wireless Access Control System, filed on August 13, 2014); AHI_BL-022 (printed publication of Wireless Access Control System and Methods for Intelligent Door Lock System, filed on August 13, 2014); AHI_BL-023 (printed publication of BLE/WIFI Bridge with Audio Sensor and Provides Communication to Other Bluetooth Devices Without Use of a Mobile Device, filed on August 13, 2014); AHI_BL-024 (printed Publication of Intelligent Door Lock System and Vibration Sensing Device to Lock or Unlock a Door, filed on August 13, 2014); AHI_BL-025 (printed publication of Intelligent Door Lock System in Communication with a Mobile Device that Detects Tappings Vibrations Which are Used to Lock or Unlock a Door, filed on August 13, 2014); AHI_BL-026 (printed publication of BLE/WIFI Bridge with Audio Sensor, filed on August 13, 2014); AHI_BL-027 (printed publication of BLE/WIFI Bridge that Learns of Activates and Provides for Operation of Lights, Adjusts Temperature and Appliance Operation, filed on August 13, 2014).

August Home's system is, therefore, prior art to the '385 Patent. And if Backertop is correct, and the accused instrumentalities do infringe, then the '385 Patent's claims are necessarily invalid as anticipated by August Home's system. August Home is prepared to file a declaratory judgement action and seek further relief via § 285, which will alert any current or future Backertop target of invalidating prior art, unless Backertop reimburses August Home for its attorneys' fee and costs incurred defending Backertop's original lawsuit and communications subsequent thereto.


FISH&RICHARDSON

Ronald W. Burns
July 15, 2022
Page 9

<u>**August Home's Patent Covering the August Home System Predates the Asserted Patent**</u>

**August Home's Patent**

August Home is the applicant and assignee of U.S. Patent No. 9,322,194 ("the '194 Patent"), which contains claims that cover the August Home system. AHI_BL-020. Importantly, the patent application for the '194 Patent was filed on March 12, 2014, predating the February 13, 2015 priority date of the asserted patent by 11 months. Additionally, the '194 Patent application was published on September 18, 2014, i.e., five months before the February 13, 2015 priority date of the asserted patent.

The '194 Patent describes systems like the system Backertop accuses of infringement in the above-referenced action. For example:

> As illustrated in FIG. 1(f) in one embodiment, a wireless communication bridge **41** is coupled to a first wireless communication device **40** that communicates with Network Systems via a device, including but not limited to a router, a 3G device, a 4G device, and the like, as well as mobile device **210**. The wireless communication bridge **41** is also coupled to a second wireless communication device **40** that is coupled to the processor **38**, circuit **18**, positioning sensing device **16**, motor **38** and the lock device **22** with bolt/lock **24**, and provides for more local communication. The first wireless communication device **40** is in communication with the second wireless communication device **40** via bridge **41**. The second wireless communication device **40** provides local communication with the elements of the intelligent door lock system **10**. In one embodiment, the second communication device **45** is a Bluetooth device. In one embodiment, the wireless communication bridge **41** includes a third wireless communication device **40**. In one embodiment, the wireless communication bridge **41** includes two wireless communication devices **40**, e.g., third and fourth wireless communication devices **40**. In one embodiment, the wireless communication bridge **41** includes a WiFi wireless communication device **40** and a Bluetooth wireless communication device **40**.

'194 Patent, 11:20–42.

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege



Ronald W. Burns
July 15, 2022
Page 10



*Id.* at Figures **1F**, **1G**.





Ronald W. Burns
July 15, 2022
Page 11



*Id.* at Figures **17, 20, 24.**

FIG. **17** is a diagram illustrating an implementation of an intelligent door lock system.

FIG. **20** illustrates one embodiment of the present invention showing a set of interactions between an intelligent door lock system, a mobile device or computer and an intelligent door lock system back-end.

FIG. **24** illustrates one embodiment of a mobile device that is used with the intelligent door lock system.

As shown in FIG. **17,**

each user's mobile device or computer 210 may interact with the intelligent door lock system back-end 68 over System Networks, including but not limited to a wired or wireless network, such as a cellular network, digital data network, computer network and may also interact with the intelligent door lock system 10 using System Networks. Each mobile device or computing device 210 may

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege



Ronald W. Burns
July 15, 2022
Page 12

> also communicate with a WiFi network 115 or Network Systems over, as a non-limiting example, a network and the WiFi network 115 may then communicate with the intelligent door lock system 10.

*Id.* at 18:64–19:7.

> FIG. **20** illustrates
>
> a set of interactions between the intelligent door lock system 100, mobile or computing device 210 and intelligent door lock system back-end 68, that may include a pairing process 138 and a lock operation process 140. During the pairing process 138, the intelligent door lock system 100 and mobile or computing device 210 can be paired to each other and also authenticated by the intelligent door lock system back-end 68.

*Id.* at 20:11–18.

> The various components shown in FIG. **24** "may be implemented in hardware, software or a combination of hardware and Software, including one or more signal processing and/or application specific integrated circuits." *Id.* at 22:35–38.

**Analysis**

If Backertop's interpretation of its own claims is correct, the '194 Patent anticipates the asserted patent. As discussed above, in its Complaint, Backertop uses the following statements about the August Home's instrumentalities to accuse August Home of infringing the asserted patent:

- "The Defendant's Infringing Instrumentalities operate based upon wireless communication between a mobile device (e.g., user's mobile device with the August Home App installed) and at least one beacon (e.g., August Smart Lock)." Compl. ¶ 10, 11.

- "The Defendant's Infringing Instrumentalities identify a present physical location of such a mobile device." *Id.* ¶ 12

- "The Defendant's infringing instrumentalities operate such that when a user's mobile device enabled with the August Home App is located at or near to its home, an August lock establishes a wireless connection with the mobile device." *Id.* ¶ 13.

- "The Defendant's infringing instrumentalities operate such that the August lock communicates via wireless connection messages with the mobile device." *Id.* ¶ 14.

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege



Ronald W. Burns
July 15, 2022
Page 13

• "The Defendant's infringing instrumentalities operate such that, when a user's mobile device is within range of the August lock, home mode is engaged and auto-unlock is disengaged." *Id.* ¶ 15.

• "The Defendant's infringing instrumentalities operate such that, when a user's mobile device is out of range of the August lock, home mode is disengaged and auto-unlock is engaged." *Id.* ¶ 16.

• "The Defendant's infringing instrumentalities retrieve location specific rules and retrieve user profile data from the mobile device." *Id.* ¶ 17.

• "The Defendant's infringing instrumentalities present content on the mobile device—via the August Home App—based upon the location specific rules and user profile data." *Id.* ¶ 18.

The '194 Patent, however, discloses and covers these purported limitations. The following are some examples of the '194 Patent's disclosures of August Home's instrumentalities:

Accused Instrumentality: "The Defendant's Infringing Instrumentalities operate based upon wireless communication between a mobile device (e.g., user's mobile device with the August Home App installed) and at least one beacon (e.g., August Smart Lock)." Compl. ¶ 10, 11.

The '194 Patent Disclosure:

Thus, as shown in FIG. 20 during the pairing process, the intelligent door look system 100 is powered on and becomes discoverable, while the mobile or computing device 210 communicates with the intelligent door lock system back-end 68, and has its credentials validated and authenticated. Once the mobile or computing device 210, and the app on the mobile or computing device 210, is authenticated, the mobile or computing device 210 discovers the lock, such as through a Bluetooth discovery process, since the intelligent door look system 100 and the mobile or computing device 210 are within a predetermined proximity to each other.

'194 Patent, 20:18–29.

Additionally, the 194 Patent discloses,

When the mobile or computing device 210 is within a predetermined proximity of the intelligent door lock system 100, which varies depending on the protocol being used, the mobile or computing device 210 can detect the advertisement from the intelligent door lock assembly 100. The application on the mobile or computing device 210 detects the intelligent door look system 100 and a communications

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege



**FISH.**
FISH & RICHARDSON

Ronald W. Burns
July 15, 2022
Page 14

session can be initiated. The token, illustrated as a key **118** in FIG. **20**, is exchanged and the lock is triggered to unlock automatically.

'194 Patent, 20:53–62.

Accused Instrumentality: "The Defendant's Infringing Instrumentalities identify a present physical location of such a mobile device." Compl. ¶ 12.

The '194 Patent Disclosure:

Once the mobile or computing device **210**, and the app on the mobile or computing device **210**, is authenticated, the mobile or computing device **210** discovers the lock, such as through a Bluetooth discovery process, since the intelligent door look system **100** and the mobile or computing device **210** are within a predetermined proximity to each other.

'194 Patent, 20:23–29.

Additionally, the '194 Patent discloses,

Once the mobile or computing device **210**, and the app on the mobile or computing device **210**, is authenticated, the mobile or computing device **210** discovers the lock, such as through a Bluetooth discovery process, since the intelligent door look system **100** and the mobile or computing device 210 are within a predetermined proximity to each other. The mobile or computing device **210** may then send a pairing code to the intelligent door look system **100**, and in turn receive a pairing confirmation from the intelligent door look system **100**. The pairing process is then completed with the processes illustrated in FIG. **20**. The lock operation may include the steps listed in FIG. **20** to operate the intelligent door look system **100** wirelessly using the mobile or computing device **210**.

*Id.* at 20:23–36.

Accused Instrumentality: "The Defendant's infringing instrumentalities operate such that when a user's mobile device enabled with the August Home App is located at or near to its home, an August lock establishes a wireless connection with the mobile device." Compl. ¶ 13.

The '194 Patent Disclosure:

Once the mobile or computing device **210**, and the app on the mobile or computing device **210**, is authenticated, the mobile or computing device **210** discovers the lock, such as through a Bluetooth discovery process, since the intelligent door look

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege



Ronald W. Burns
July 15, 2022
Page 15

system **100** and the mobile or computing device **210** are within a predetermined proximity to each other.

'194 Patent, 20:23–29.

Accused Instrumentality: "The Defendant's infringing instrumentalities operate such that the August lock communicates via wireless connection messages with the mobile device." Compl. ¶ 14

The '194 Patent Disclosure:

When the mobile or computing device **210** is within a predetermined proximity of the intelligent door look system **100**, which varies depending on the protocol being used, the mobile or computing device **210** can detect the advertisement from the intelligent door lock assembly **100**. The application on the mobile or computing device **210** detects the intelligent door look system **100** and a communications session can be initiated."

*Id.* at 20:53–60.

Accused Instrumentality: "The Defendant's infringing instrumentalities operate such that, when a user's mobile device is within range of the August lock, home mode is engaged and auto-unlock is disengaged." Compl. ¶ 15.

The '194 Patent Disclosure:

The intelligent door lock system **100** may also allow the user to disable auto-unlock, at which time the application on the user's mobile or computing device **210** can provide a notification which then allows the user to press a button on the mobile or computing device **210** to lock or unlock the lock.

The intelligent door lock system **100** may also allow for the triggering of multiple events upon connection to an intelligent door look system **100** by a mobile or computing device **210**. As a non-limiting example, the intelligent door look system **100** can detect and authenticate the mobile or computing device **210**, as described herein, and initiate a series of actions, including but not limiting to, unlocking doors **100**, turning on lights, adjusting temperature, turning on Stereo etc. The commands for these actions may be carried out by the mobile or computing device **210** or the intelligent door lock system back-end **68**. In addition, through a web interface of the intelligent door lock system back-end **68**, the user may define one or more events to be triggered upon proximity detection and authentication of the user's mobile or computing device **210** to the intelligent door look system **100**.

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege



**FISH.**
FISH & RICHARDSON

Ronald W. Burns
July 15, 2022
Page 16

'194 Patent, 21:2–22.

Additionally, the '194 Patent claims,

An intelligent door lock system at a dwelling with a door, comprising:

a position sensing device coupled to a drive shaft of a lock device, the position
    sensing device sensing position of the drive shaft and configured to assist in
    locking and unlocking a lock of a lock device;

an engine with a memory coupled to the positioning sensing device and the drive
    shaft, wherein the memory stored with states of the door that are used with the
    position sensing device to determine if the door is locked or unlocked, the
    engine configured to provide energy to the intelligent door lock system for
    locking and unlocking of the door;

an energy source configured to provide electrical energy;

a device coupled to the energy source and the engine, the device configured to
    convert electrical energy received from the energy source into mechanical
    energy; and

the intelligent door lock system is in communication with a user's mobile device
    that communicates with the position sensing device,

wherein when the user's mobile device is at an exterior of the dwelling and in a
    close proximity to the dwelling, the drive shaft is caused to rotate by the engine
    and the energy source to provide an unlocking of the door when the door is in
    a locked state.

*Id.*, Claim 1.

The '194 Patent also claims, "The system of claim 1, wherein the lock device can be locked
or unlocked using a mobile device." *Id.*, Claim 14.

Accused Instrumentality: "The Defendant's infringing instrumentalities operate such that,
when a user's mobile device is out of range of the August lock, home mode is disengaged and
auto-unlock is engaged." Compl. ¶ 16.

The '194 Patent Disclosure:

"The intelligent door lock system **100** may also allow for the triggering of multiple
events upon connection to an intelligent door look system **100** by a mobile or

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege



Ronald W. Burns
July 15, 2022
Page 17

> computing device **210**. As a non-limiting example, the intelligent door lock system **100** can detect and authenticate the mobile or computing device **210**, as described herein, and initiate a series of actions, including but not limiting to, unlocking doors **100**."

*Id.* at 21:8–14.

> Additionally, the '194 Patent discloses,

> Once the mobile or computing device **210**, and the app on the mobile or computing device **210**, is authenticated, the mobile or computing device **210** discovers the lock, such as through a Bluetooth discovery process, since the intelligent door lock system **100** and the mobile or computing device **210** are within a predetermined proximity to each other. The mobile or computing device **210** may then send a pairing code to the intelligent door lock system **100**, and in turn receive a pairing confirmation from the intelligent door lock system **100**. The pairing process is then completed with the processes illustrated in FIG. **20**. The lock operation may include the steps listed in FIG. **20** to operate the intelligent door lock system **100** wirelessly using the mobile or computing device **210**.

*Id.* at 20:23–36.

> Moreover, the '194 Patent discloses, "For entry, communication with the lock device **22** may be different. In one embodiment, it can be locking coupled with close proximity to a mobile device that is exterior to the door." *Id.* at 60–62. And,

> When the mobile or computing device **210** is within a predetermined proximity of the intelligent door lock system **100**, which varies depending on the protocol being used, the mobile or computing device **210** can detect the advertisement from the intelligent door lock assembly **100**. The application on the mobile or computing device **210** detects the intelligent door lock system **100** and a communications session can be initiated. The token, illustrated as a key **118** in FIG. **20**, is exchanged and the lock is triggered to unlock automatically.

*Id.* at 20:53–62.

> <u>Accused Instrumentality</u>: "The Defendant's infringing instrumentalities retrieve location specific rules and retrieve user profile data from the mobile device." Compl. ¶ 17.

> <u>The '194 Patent Disclosure:</u>

> For example: person A arrives home and its mobile or computing device **210** is authenticated by the intelligent door lock system **100**. His identity is shared with

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege


FISH & RICHARDSON

Ronald W. Burns
July 15, 2022
Page 18

> the intelligent door lock system back-end **68**. The intelligent door lock system back-end **68** may send environmental changes to other home controllers, such as "adjust heat to 68 degrees."

*Id.* at 21:29–34.

> Accused Instrumentality: "The Defendant's infringing instrumentalities present content on the mobile device—via the August Home App—based upon the location specific rules and user profile data." Compl. ¶ 18.

> The '194 Patent Disclosure:

> For example: person A arrives home and its mobile or computing device **210** is authenticated by the intelligent door lock system **100**. His identity is shared with the intelligent door lock system back-end **68**. The intelligent door lock system back-end **68** may send environmental changes to other home controllers, such as "adjust heat to 68 degrees."

'194 Patent, 21:29–34.

> Additionally, the '194 Patent discloses,

> In one embodiment, AI is used to process information from the intelligent door lock system **10**, from mobile device **210**, and the like. The back-end **68** can compute scores associated with various risk variables involving the intelligent door lock system **10**. These score can be compared to a minimum threshold from a database and an output created. Alerts can be provided to the intelligent door lock system **10**, mobile device **210** and the like. The alert can provide a variety of options for the intelligent door lock system **10** to take, categorizations of the received data from the mobile device **210**, the intelligent door lock system **10**, and the like, can be created. A primary option can be created as well as secondary options.

*Id.* at 15:3–14. Moreover, the '194 Patent discloses,

> When the time has expired, the intelligent door system **10** can then lock the door **12**. Upon detecting a successful door locking event, the intelligent door lock system **10** can advise the door operator that there is a successful door locking. If the door locking is not successful, the intelligent door lock system **10** can provide a message to the door operator via a variety of means, including but not limited to a message or alert to the door lock operators mobile device. Such a mobile device message provides the door operator with notification that door locking was not successful or achieved, and the door lock operator can then take action to lock the door **12** either in person, wirelessly, and the like.

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege


**FISH.**
FISH & RICHARDSON

Ronald W. Burns
July 15, 2022
Page 19

*Id.* at 47–59.

The '194 Patent is, therefore, prior art to the '385 Patent. As with the August Home system itself, disclosure of this patent on the public record would risk invalidation of the '385 Patent, either by August Home or some other Backertop target.

**Conclusion**

Pursuant to the foregoing arguments and those in August Home's § 101 Motion to Dismiss, it was obvious that Backertop was pursuing "exceptionally" baseless claims. August Home will defend itself via all means available to it, including filing a declaratory judgment action, seeking further relief via § 285 and making public its prior art contentions, rendering future assertion of the '385 Patent futile.

If Backertop refuses to reimburse August Home's attorneys fees and cost, please let me know your availability to meet and confer the week of October 24, 2022, as August Home may proceed with filing a declaratory judgment action to pursue invalidation of Backertop's asserted patent and reimbursement of August Home's fees and costs.



**FISH.**
FISH & RICHARDSON

Ronald W. Burns
July 15, 2022
Page 20

Sincerely,



Ricardo Bonilla
Principal

CC:   Jimmy Chong
      Chong Law Firm PA
      2961 Centerville Road,
      Suite 350
      Wilmington, DE 19808
      chong@chonglawfirm.com


Enclosure:

Exhibits ABI_BL-001–027.

**BACKERTOP0169**
Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

**Subject:** Re: FW: 2022-10-13 Correspondence re Backertop Licensing LLC v. August Home, Inc.
**From:** Papool Chaudhari <papool@pralawllc.com>
**To:** Ronald Burns <ron@freship.com>
**Cc:** Brandon LaPray <brandon@ip-edge.com>, Linh Deitz <linhd@ip-edge.com>, Danae Maher <dmaher@ip-edge.com>
**Date Sent:** Tuesday, November 1, 2022 12:59:41 PM GMT-06:00
**Date Received:** Tuesday, November 1, 2022 1:00:01 PM GMT-06:00

Ron,

Where are we on this?  Per OC, we need to get this done today or else they are filing a DJ tomorrow.  I saw you sent the CNS to them last week, but wasn't sure of current status.  Please advise and bug Riqui until this gets done today to avoid the DJ.

Thanks,

Papool

On Thu, Oct 27, 2022 at 11:40 AM Papool Chaudhari <papool@pralawllc.com> wrote:
> Ron,
>
> Backertop is not agreeable to paying August Home's attorneys, fees, but, Riqui's email, Backertop is willing to grant a broad CNS that would include Backertop and its principal (Lori is the only owner, so it would extend to any company Lori owns).  Attached is a draft CNS that gives that broad coverage.  Please send to them and let them know Backertop is ready to execute this now and wants to get this done before their deadline.
>
> Thanks,
>
> Papool
>
>
> On Wed, Oct 26, 2022 at 4:39 PM Ronald Burns <ron@freship.com> wrote:
>
>> Please advise as to whether or not the CNS terms are acceptable.
>>
>>
>> Thanks,
>>
>> Ron

**Ronald Burns | Counsel**

**Registered Patent Attorney, Trademark Attorney**

a: FRESH IP PLC | 5999 Custer Road, Suite 110-507

Frisco, TX 75035 | USA

e: ron@freship.com | w:www.freship.com

**FRESH**

**Direct:** 972-632-9009

EXHIBIT
06

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

**From:** Ricardo Bonilla <rbonilla@fr.com>
**Date:** Wednesday, October 26, 2022 at 5:34 PM
**To:** Ronald Burns <ron@freship.com>
**Subject:** RE: 2022-10-13 Correspondence re Backertop Licensing LLC v. August Home, Inc.

Hi Ron,

I'm checking in to see if you have any updates from your client's end. August Home is prepared to file its declaratory judgment complaint unless the parties have an agreement in place prior to next Wednesday, November 2. August Home seeks what it requested in its letter (full peace and reimbursement of its attorneys' fees). Short of that, it may be willing to accept a broad license or covenant not to sue that includes Backertop and its principals. If neither is palatable to your client(s), August Home will proceed to file its DJ action in DE next Wednesday.

Let me know if you'd like to discuss.

Thanks,
Riqui

--
Papool Chaudhari
papool@pralawllc.com

--
Papool Chaudhari
papool@pralawllc.com

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

**Subject:** URGENT - Backertop Licensing v August Homes - CNS Agreement ready for your signature
**From:** Linh Deitz <linhd@ip-edge.com>
**To:** Lori LaPray <lorilapray@gmail.com>
**Cc:** Papool Chaudhari <papool@pralawllc.com>, Danae Maher <dmaher@ip-edge.com>
**Date Sent:** Monday, April 10, 2023 1:39:27 PM GMT-06:00
**Date Received:** Monday, April 10, 2023 1:39:45 PM GMT-06:00
**Attachments:** Backertop AAAB final agmt v2 with Backertop info.pdf

Hello Lori,

Please see attached a CNS agreement between Backertop Licensing and August Homes. Can you please sign the agreement and send it back to me as soon as possible. This is urgent and is needed back today. The agreement has been reviewed and approved to finalize.


Sincerely,

Linh Deitz
Office Manager
IP Edge LLC

EXHIBIT

O7

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into as of date of signature of the last signatory below (the "Effective Date") by and between Backertop Licensing LLC, whose address is 2100 14th St, Suite 107 PMB 1044, Plano, TX 75074-6444 ("Backertop"), Mavexar LLC, whose address is 2150 S Central Expy Ste 200, McKinney, TX 75070 ("Mavexar"), and IP EDGE LLC, whose address is 2150 S Central Expy Ste 200, McKinney, TX 75070 ("IP EDGE"), on the one hand, and ASSA ABLOY AB whose mailing address is P.O. Box 70340, SE-107 23 Stockholm, Sweden ("ASSA ABLOY"), on the other hand. Backertop, Mavexar, IP EDGE, and ASSA ABLOY are individually referred to herein as a "Party," and collectively as the "Parties." Backertop, Mavexar, and IP EDGE are collectively referred herein as the "Backertop Entities."

### RECITALS

WHEREAS, Backertop sued August Home Inc., an Affiliate [defined herein] of ASSA ABLOY in an action for patent infringement, styled *Backertop Licensing LLC v. August Home Inc.*, in the United States District Court for the District of Delaware, Civil Action No. 1:22-cv-00574-CFC ("Litigation");

WHEREAS, August Home Inc. denied any liability in the Litigation;

WHEREAS, Backertop filed a voluntary dismissal without prejudice of the Litigation, but the Court has not yet dismissed or otherwise closed the case;

WHEREAS, the Parties wish to settle all claims that were, or could have been, asserted by either Party against the other in the Litigation or otherwise without further time and expense of litigation or other legal action; and

NOW, THEREFORE, in consideration of the above premises and mutual covenants contained herein and other good and valuable consideration, the sufficiency of which is agreed upon, the Parties agree as follows:

## 1. DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

1.1.  **"Affiliate"** means, with respect to a first Entity, any other Entity that, in the past, present, or future, is Controlling, Controlled by, or under common Control with such first Entity.

1.2.  **"Control"** of an Entity can only be exercised by an Entity recognized by law and means (a) ownership, directly or indirectly, of fifty percent (50%) or more of the voting equity of such Entity or, in the case of a non-corporate Entity, equivalent interests; or (b) solely with respect to ASSA ABLOY (as defined below in Section 1.4), power (whether through contract or otherwise, direct or indirect) to direct management or management policies of such Entity.

1

**BACKERTOP0017**
Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

1.3.  **"Divest," "Divests,"** or **"Divestiture"** mean any sale, assignment, issuance, exchange, merger, consolidation, transfer, conveyance, or other divestiture that results in a change of ownership or beneficial interest, regardless of form.

1.4.  **"ASSA ABLOY"** means ASSA ABLOY AB and its Affiliates.  For purposes of this Agreement, August Home Inc. is an Affiliate of ASSA ABLOY AB.

1.5.  **"Entity"** means a person, trust, corporation, partnership, joint venture, limited liability company, association, unincorporated organization or other legal entity.

1.6.  **"Covered Patents"** means: (a) those identified in **Exhibit A** attached hereto; (b) all other patents and patent applications owned or controlled by the Backertop Entities or their Affiliates (or that the Backertop Entities or their Affiliates have the right to license or enforce) as of the Effective Date or any time thereafter; (c) all amendments, continuations, continuations-in-part, divisionals, extensions, non-provisionals, provisionals, reissues, reviews, renewals, substitutions, reexaminations, and foreign equivalents of any of the foregoing owned or controlled by the Backertop Entities or their Affiliates (or that the Backertop Entities or their Affiliates have the right to license or enforce); (d) all patents and patent applications claiming priority, in whole or in part, to or through, or sharing a common priority claim with, the patents described in any of the foregoing owned or controlled by the Backertop Entities or their Affiliates (or that the Backertop Entities or their Affiliates have the right to license or enforce); and (e) all foreign counterparts of any of the foregoing owned or controlled by the Backertop Entities or their Affiliates (or that the Backertop Entities or their Affiliates have the right to license or enforce).

1.7.  **"Covered Products and Services"** means all products, services, systems, methods or components (alone or in any combination with any other products, services, systems, methods or components) that practice or could be alleged to practice a claim of a Covered Patent made, used, sold, offered for sale, leased, distributed, imported, exported, exploited, owned, operated, developed, advertised, or otherwise disposed of by or on behalf of ASSA ABLOY and/or its Affiliates and/or made, used, sold, offered for sale, leased, distributed, imported, exported, exploited, owned, operated, developed, advertised, or otherwise disposed of under ASSA ABLOY's and/or its Affiliates' trademarks or brand names.

1.8.  **"Covered Third Parties"** means, solely with respect to Covered Products and Services, direct and indirect vendors, suppliers, manufacturers, developers, contractors, partners, hosts, distributors, resellers, customers and end-users of the Covered Products and Services provided by or on behalf of ASSA ABLOY and/or its Affiliates or marketed under ASSA ABLOY's and/or its Affiliates' trademarks or brand names.  This term further includes any third party, solely with respect to Covered Products and Services, that has a legal or contractual right to defense or indemnity by ASSA ABLOY or any other Covered Third Party solely with respect to claims of infringement of a Covered Patent by a Covered Product or Service.

2

## 2. **LICENSE AND COVENANTS**

2.1. The Backertop Entities, on behalf of themselves and their Affiliates, hereby grant to ASSA ABLOY, its Affiliates, and Covered Third Parties (solely with respect to Covered Products and Services), a perpetual, fully paid-up, nonexclusive, nontransferable (except as permitted under Section 5), royalty free, non-cancelable, irrevocable, worldwide license under the Covered Patents to make, have made, use, have used, sell, have sold, offer for sale, have offered for sale, lease, have leased, distribute, have distributed, import, have imported, export, have exported, exploit, have exploited, own, have owned, operate, have operated, develop, have developed, advertise, have advertised, and otherwise dispose or have disposed of the Covered Products and Services. The license to the Covered Third Parties allows the Covered Third Parties to (a) make, use, sell, offer to sell, exploit, lease, distribute, import, and/or export products and services solely with respect to the Covered Products and Services, and (b) perform work on behalf of ASSA ABLOY and its Affiliates solely with respect to the Covered Products and Services. Any conveyance or transfer of any right in a Covered Patent shall be, and hereby is, encumbered by the foregoing license. The Backertop Entities and their Affiliates shall ensure that any conveyances of any right in any Covered Patent bind all assignees and licensees to the foregoing license. For the avoidance of doubt, pursuant to this agreement: (i) ASSA ABLOY or its Affiliates; or (ii) Covered Third Parties solely with respect to Covered Products and Services may not be sued for alleged infringement of any Covered Patent at any time after the Effective Date.

2.2. The Backertop Entities, on behalf of themselves and their Affiliates, hereby covenant that they will not directly or indirectly institute, file or cause to be filed, maintain, assist with, or advise to be commenced, or threaten, any action or suit against ASSA ABLOY, any of its Affiliates, or (solely with respect to Covered Products and Services) any Covered Third Party under any Covered Patent. The following further terms apply to the foregoing covenant ("CNS"):

2.2.1. The CNS will run with all Covered Patents, and will bind any future owner, licensor, or licensee of any Covered Patent. Any conveyance or transfer of any right, title, or interest in or to a Covered Patent shall be, and hereby is, encumbered by the same CNS. The Backertop Entities and their Affiliates shall ensure that any conveyances of any right in any Covered Patent bind all assignees and licensees to this CNS. For the avoidance of doubt, pursuant to this agreement, ASSA ABLOY or its Affiliates may not be sued for alleged infringement of any Covered Patent at any time after the Effective Date.

2.3. No Other Rights. No rights or covenants are granted under any patents except as expressly provided herein, whether by implication, estoppel or otherwise. The license granted to ASSA ABLOY and its Affiliates in Section 2.1 above does not confer upon ASSA ABLOY and its Affiliates the right to grant or otherwise transfer any rights under the Covered Patents to any other persons or entities for any purpose, except as specifically set

3

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

forth in this Agreement.

## 3. **RELEASE**

3.1. **Backertop Entities' Release.** The Backertop Entities, on behalf of themselves and their Affiliates, and each of their exclusive licensees successors-in-interest, assigns, officers, directors, managers, members, stockholders, experts, consultants, attorneys, representatives, heirs, agents and employees, and all persons acting by, through, under or in concert with any of the foregoing (collectively, the "Releasing Parties"), hereby fully, finally, and forever releases, acquits and discharges ASSA ABLOY, its Affiliates, Covered Third Parties solely with respect to Covered Products and Services, and (solely in their role with respect to Covered Products and Services) each of its and their direct and indirect vendors, suppliers, manufacturers, developers, contractors, partners, hosts, distributors, resellers, customers end-users, licensors, predecessors, successors-in-interest, assigns, officers, directors, managers, members, stockholders, experts, consultants, attorneys, representatives, heirs, agents and employees, and all persons acting by, through, under or in concert with any of the foregoing (collectively, the "Released Parties"), from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of actions, suits, rights, demands, losses, debts, costs and expenses (including fees of attorneys and other professionals) of any nature whatsoever in law, equity or otherwise, known or unknown, suspected or unsuspected, fixed or contingent (collectively, "Claims"), which the Releasing Parties had or now has or claims to have, or which the Releasing Parties at any time hereafter may have or claim to have against the Released Parties, or any of them, under the Covered Patents for any and all past, present, and future claims or allegations of infringement, inducement to infringe, contributory infringement, damages, enhanced damages, and attorneys' fees, that in any way relate to or arise out of: (i) any of the Covered Patents in connection with the Covered Products and Services; or (ii) the conduct of the Litigation. The Backertop Entities, on behalf of themselves and the other Releasing Parties, also hereby fully, finally, and forever release, acquit and discharge the Covered Third Parties from Claims arising from infringement of the Covered Patents in connection with making, having made, using, selling, offering for sale, leasing, distributing, importing, exporting, exploiting, owning, operating, developing, advertising, or otherwise disposing of Covered Products and Services for or on behalf of ASSA ABLOY or its Affiliates or using the Covered Products and Services provided by ASSA ABLOY or its Affiliates. This provision does not prohibit the Backertop Entities or its Affiliates from pursuing remedies, such as filing a claim, in the event the ASSA ABLOY or its Affiliates violate this Agreement.

3.2. **ASSA ABLOY Release.** The Released Parties hereby fully, finally, and forever releases, acquits and discharges the Releasing Parties from any and all Claims which the Released Parties had or now has or claims to have, or which the Released Parties at any time hereafter may have or claim to have against the Releasing Parties, or any of them (including but not limited to Claims for damages, enhanced damages, costs, expenses, and attorneys' fees) that in any way relate to or arise out of: (i) the Covered Patents, (ii) the Litigation, (iii) Backertop's filing of the Litigation; or (iv) the conduct of the Litigation. This provision does not prohibit ASSA ABLOY or its Affiliates from pursuing remedies,

4

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

such as filing a claim, in the event the Backertop Entities violate this Agreement.

3.3. **Contesting Validity.** ASSA ABLOY agrees that ASSA ABLOY and its Affiliates shall not challenge, or assist others in challenging in any way, the validity and enforceability of any Covered Patent, except that ASSA ABLOY and its Affiliates shall have the right to challenge the validity and enforceability of any Covered Patent in defense to a suit or assertion of a claim relating to any Covered Patent that is brought against ASSA ABLOY, its Affiliates, Covered Third Parties solely with respect to Covered Products and Services.

3.4. **Unknown Claims.** Each Party hereby acknowledges and expressly waives the provisions of Section 1542 of the California Civil Code (and similar provisions in other jurisdictions) with respect to the releases granted in this Agreement, which provides: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY. Each Party understands and agrees that Section 1542 (and similar provisions in other jurisdictions), if applicable herein, gives such Party the right not to release existing claims of which it is not now aware and does not suspect to exist, unless it voluntarily chooses to waive such right. Even though such Party is aware of such right, such Party nevertheless hereby voluntarily waives the right described in Section 1542 (and similar provisions in other jurisdictions), and elects to assume all risks for claims released under this Agreement that now exist in such Party's favor, known or unknown, and expressly waives any rights under any other statutes or common law principles of similar effect with respect to the releases granted in this Agreement.

3.5. **Safe Harbor.** In the case of breach of this Agreement by either Party, the allegedly breaching Party must be provided written notice of the alleged breach within 10 days of such alleged breach. Such an alleged breach shall not be considered a breach and there shall be no damages for the alleged breach of this Agreement if the allegedly breaching Party fully cures it within 30 days of such written notice.

4. **DISMISSAL.** Within 3 court days after Effective Date, the Parties shall cause their respective counsel to execute and file the stipulated motion in the form set forth in **Exhibit B** dismissing with prejudice all claims asserted by Backertop in the Litigation without a court order and with each Party bearing its own costs, fees, and expenses. The Parties shall promptly proceed with any and all additional procedures needed to dismiss with prejudice the Litigation and withdraw all pending motions. Upon filing of the stipulated motion and except upon the express request of the court, neither ASSA ABLOY, its Affiliates, nor its attorneys will participate in any further activity in the Litigation. Furthermore, upon filing of the stipulated motion and except upon the express request of the court, ASSA ABLOY, its Affiliates, and its attorneys will not take any action that increases the costs, expenses, and attorneys' fees of any Backertop Entities in the Litigation. The Parties (including August Home Inc.) further agree that each Party (including August Home Inc.) shall bear its own costs, attorney's fees, and expenses associated with the Litigation and any negotiations between the Parties. In the event the court makes an

5

express request of, or suggestion to, ASSA ABLOY or its Affiliates to file a motion for fees, costs, expenses or any adversarial motion or similar filing, ASSA ABLOY will inform the court that it declines to pursue any such motion or document and ASSA ABLOY will decline to collect any monetary award or payment, *sua sponte* or otherwise, and releases the Backertop Entities from any such monetary award or payment.  The Parties acknowledge and agree that this Agreement is enforceable according to its terms with respect to final dismissal with prejudice of all claims and counterclaims in the Litigation.

5.  **ASSIGNMENT**

    5.1. **Permitted Assignment by ASSA ABLOY.**

        5.1.1.  ASSA ABLOY may assign its rights under this Agreement to one of its Affiliates without the consent of any Party.

        5.1.2.  ASSA ABLOY may assign its rights under this Agreement, in whole or in part, without the consent of any Party, in connection with the sale or transfer of all or substantially all of the assets of ASSA ABLOY  pursuant to one or a series of transactions (a "Transaction").   In the event of a Transaction, the rights of the assigning party hereunder shall continue and extend to the acquiring Entity only to the extent of Covered Products and Services at the time of the merger, sale or acquisition, and the reasonable growth and evolution thereof, and shall not extend to any other operations of any entity that is merged with or  acquired the Assets, even if the operations are of the same type as the business.   The licenses, covenants, and releases contained herein shall run with the rights being assigned or transferred and shall be binding on any successors-in-interest, transferees, or assigns thereof.

        5.1.3.  If ASSA ABLOY divests itself of an Affiliate, or business unit, or all or a substantial portion of the assets of any Affiliate or business unit, line of business, business, operating unit or division or any other organizational component of ASSA ABLOY or an Affiliate thereof (each a "Former Affiliate"), the licenses, covenants, and releases granted herein will continue to extend to ASSA ABLOY and, its Affiliates and any past, present and future Covered Products and Services thereof, including the reasonable growth and evolution thereof.  The licenses, covenants, and releases granted herein would continue to extend to the Former Affiliate for any Covered Products and Services of the Former Affiliate existing up until the Divestiture, including the reasonable growth and evolution thereof.

    5.2. **Acquisitions by ASSA ABLOY.**  In the event of an acquisition of a third party by ASSA ABLOY, the third party's make, have made, use, have used, sell, have sold, offer for sale, have offered for sale, lease, have leased, distribute, have distributed, import, have imported, export, have exported, exploit, have exploited, own, have owned, operate, have operated, develop, have developed, advertise, have advertised, and otherwise dispose or have disposed of after, but not prior to, the date of acquisition shall be deemed Covered

6

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

Products and Services under this Agreement.

5.3. **Permitted Assignment by the Backertop Entities.**  The Backertop Entities shall be permitted to assign or exclusively license one or more of the Covered Patents and/or their rights under this Agreement without the consent of any Party, provided that all of the licenses, covenants, releases, other rights granted, and other terms and conditions of this Agreement contained herein shall run with the rights being assigned, and such assignee or exclusive licensee agrees in writing to be legally bound by the patent licenses, covenants, releases, other rights granted and other terms and conditions of this Agreement contained herein prior to such assignment or license.  The Backertop Entities must provide a copy of this Agreement to any such assignee or exclusive licensee.

5.4. **Unpermitted Assignment Void.**  Any attempted transfer, license, assignment, or grant not expressly permitted herein shall be null and void.

6.  <u>**REPRESENTATIONS AND WARRANTIES**</u>

6.1. <u>Backertop Entities' Representations</u>.  The Backertop Entities hereby represent and warrant, on behalf of themselves and their Affiliates, that: (a) the respective persons executing this Agreement on behalf of the respective Backertop Entities have the full corporate power, right, and authority to execute and deliver this Agreement on behalf of the respective Backertop Entities and their Affiliates, and to consummate the transactions contemplated hereby; (b) Each of the Backertop Entities (as relevant solely to the respective applicable Covered Patents owned by such Backertop Entity) has full, complete and exclusive rights to grant all releases, licenses, covenants and other rights granted under this Agreement with respect to the Covered Patents owned by such Backertop Entity without payment of any consideration to, or consent of, any third party; (c) Each of the Backertop Entities (as relevant solely to the respective applicable Covered Patents owned by such Backertop Entity) is the sole owner(s) of all rights, title and interest in and to the Covered Patents owned by such Backertop Entity, including any and all rights to claim for past damages; (d) the Backertop Entities (as relevant solely to the respective applicable Covered Patents owned by a respective Backertop Entity) have the exclusive right to enforce the Covered Patents owned by such Backertop Entity, and no third party has any right to enforce the relevant Covered Patents or recover for infringement of such Covered Patents; (e) the Backertop Entities (as relevant solely to the applicable Covered Patents owned by a respective Backertop Entity) have not assigned or otherwise transferred to any other Person any rights to any actions, causes of action, claims or demands, or any Covered Patents owned by such Backertop Entity or defenses, in each case, licensed or released hereunder; (f) there is no other Entity whose consent to this Agreement or whose joinder herein is necessary to make fully effective the provisions of this Agreement; (g) as of the Effective Date, the Backertop Entities do not own, control, or have the right to license or enforce any patents or patent applications other than the Covered Patents owned by the relevant Backertop Entity; (h) in the event that the Backertop Entities or their Affiliate transfers any Covered Patent in the future, all rights, releases, licenses, and covenants granted under this Agreement will run with such Covered Patent; and (i) no Affiliate of the Backertop Entities has assigned or exclusively licensed any Covered Patent in

7

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

violation of 5.3.

6.2. <u>ASSA ABLOY Representations</u>. ASSA ABLOY AB hereby represent and warrant as of the Effective Date that: (a) they each have the full corporate power, right, and authority to grant all rights, covenants, and releases of the full scope set forth herein; and (b) the persons executing this Agreement on behalf of ASSA ABLOY AB have the full corporate power, right, and authority to execute and deliver this Agreement on ASSA ABLOY AB's behalf, and to consummate the transactions contemplated hereby; (c) there is no other Entity whose consent to this Agreement or whose joinder herein is necessary to make fully effective the provisions of this Agreement.

6.3. **WARRANTY DISCLAIMERS.** (A) EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, THE RIGHTS GRANTED UNDER THIS AGREEMENT ARE GRANTED IN "AS IS" CONDITION; (B) EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN SECTIONS 6.1 AND 6.2 ABOVE, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, INCLUDING WITHOUT LIMITATION, EXPRESS, IMPLIED, STATUTORY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, PATENT ENFORCEABILITY, OR PATENT VALIDITY REPRESENTATIONS AND/OR WARRANTIES; AND (C) BACKERTOP ENTITIES MAKE NO REPRESENTATION THAT THE USE OF THE COVERED PATENTS IN CONNECTION WITH THE MANUFACTURE, USE, SALE, OFFER FOR SALE, OR IMPORT OF LICENSED PRODUCTS WILL NOT INFRINGE, DIRECTLY, CONTRIBUTORILY, OR BY INDUCEMENT, ANY PATENT, COPYRIGHT, TRADEMARK OR OTHER PROPRIETARY RIGHT OF ANY THIRD PARTY.

6.4. Absent willful misconduct, neither Party shall be liable to the other Party for any special, indirect, incidental or consequential damages with respect to this Agreement, even if informed of the possibility thereof in advance. These limitations apply to all causes of action in the aggregate, including without limitation, breach of contract, breach of warranty, negligence, strict liability, fraud, misrepresentation and other torts, loss of profit, loss of business, loss of savings or other loss.

7. **BANKRUPTCY.** Each Party acknowledges and agrees that all rights and licenses, covenants and releases granted by such Party under or pursuant to this Agreement are, and will otherwise be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code (the "Bankruptcy Code"), licenses of rights to "intellectual property" as defined under Section 101(35A) of the Bankruptcy Code. Each Party further acknowledges and agrees that if Licensor (or any other Person to which Licensor has assigned this Agreement or that then owns any of the Covered Patents), as a debtor in possession or a trustee-in-bankruptcy in a case under the Bankruptcy Code, rejects this Agreement, ASSA ABLOY or any Covered Third Party may elect to retain its rights under this Agreement as provided in Section 365(n) of the Bankruptcy Code. Each Party irrevocably waives all arguments and defenses arising under 11 U.S.C. § 365(c)(1) or successor provisions to the effect that applicable law excuses the party, other than the debtor, from accepting performance from or rendering performance to an entity other than the debtor or debtor in possession as a basis for opposing assumption or assignment of the

8

Agreements by the other party in a case under Chapter 11 of the Bankruptcy Code to the extent that such consent is required under 11 U.S.C. § 365(c)(1) or any successor statute. Without limiting the foregoing, the Parties acknowledge that the rights, license, covenants, and releases granted pursuant to this Agreement, to the maximum extent permitted by law, will not be affected by the rejection of this Agreement in bankruptcy, and will continue subject to the terms and conditions of this Agreement. In the event that this Agreement is rejected or deemed rejected in a bankruptcy proceeding (a "Rejection"), the debtor Party will provide written notice thereof to the non-debtor Party. To the extent any rights under this Agreement are determined by a bankruptcy court not to be "intellectual property" rights for purposes of Section 365(n) of the Bankruptcy Code, all of such rights will remain vested in and fully retained by the non-debtor Party after any such Rejection.

8. **CONFIDENTIALITY**. Neither Party will disclose the terms or the existence of this Agreement, except in the following circumstances:

    8.1. As required by any law, rule, regulation, order, discovery request, subpoena or other governmental requirement (including public reporting requirements); provided that such disclosure is made pursuant to a protective order, provided however, that any production under a protective order would be protected under an "Outside Attorney Eyes Only" or higher confidentiality designation or agreement providing confidentiality protections at least as stringent as those provided in this paragraph, to the extent possible;

    8.2. To such Party's accountants, attorneys financial advisors, litigation consultants, and other professionals engaged by such Party, as reasonably required for their performance of services for such Party; provided that such disclosure will be governed by the confidentiality provisions set forth herein;

    8.3. To such Party's Affiliates or parent entities, and any of their officers, directors and employees as reasonably required for their performance of services for such Party's Affiliates or parent entities;

    8.4. As reasonably required for due diligence in connection with any proposed assignment of this Agreement or any proposed transaction involving any Backertop Entity, ASSA ABLOY, or ASSA ABLOY Affiliates; provided that such disclosure will be governed by the confidentiality provisions substantially similar to (or more stringent than) those set forth herein;

    8.5. With the prior written consent of the other Party, which shall not be unreasonably denied, delayed, or conditioned;

    8.6. Both Parties may disclose that the dispute between the parties has been resolved;

    8.7. Either Party may disclose in the course of any legal proceeding to support any claim or defense; provided that such disclosure is made pursuant to a protective order, provided however, that any production under a protective order would be protected under an "Outside Attorney Eyes Only" or higher confidentiality designation or agreement

9

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

providing confidentiality protections at least as stringent as those provided in this paragraph, to the extent possible;

8.8. ASSA ABLOY may generally describe to any Entity receiving rights under this Agreement, or otherwise protected by the terms of this Agreement, the nature of that Entity's rights or protections, provided that such disclosure will be governed by confidentiality provisions substantially similar to (or more stringent than) those set forth herein.

8.9. The Backertop Entities may disclose the terms and existence of this Agreement (including the Parties) to any third party with a financial interest in the Covered Patents, potential financing sources, potential assignees, successors, or purchasers of the Covered Patents so long as such party is bound to confidentiality provisions substantially similar to (or more stringent than) those set forth herein.

9. **NOTICES**. All notices required or permitted to be given hereunder shall be in writing and shall be delivered by hand, by e-mail, or if dispatched by prepaid air courier with package

10

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

tracing capabilities or by registered or certified airmail, postage prepaid, addressed as follows:

> If to Backertop:
> Backertop Licensing LLC
> Lori LaPray, Managing Member
> 2100 14th St, Suite 107 PMB 1044
> Plano, TX 75074
>
> *Copy to*:
> papool@pralawllc.com
>
> If to Mavexar:
> Mavexar LLC
> Gautham Bodepudi, Managing Member
> 2150 S. Central Expy, Suite 200
> McKinney, TX 75070
>
> *Copy to*:
> papool@pralawllc.com
>
> If to IP EDGE:
> IP EDGE LLC
> Gautham Bodepudi, Managing Member
> 5300 N. Braeswood Blvd, Suite 4-V620
> Houston, TX 77096
> ops@ip-edge.com
>
> *Copy to*:
> papool@pralawllc.com
>
>
> If to ASSA ABLOY:
> ASSA ABLOY AB
> c/o General Counsel
> P.O. Box 70340
> SE-107 23 Stockholm
> Sweden
>
> *Copy to:*
> marchese@fr.com

9.1. Such notices shall be deemed to have been served when received by addressee.  Either Party may give written notice of a change of address and, after notice of such change has been received, any notice or request shall thereafter be given to such Party as above

**BACKERTOP0027**
Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

provided at such changed address.

10. **NON-AGENCY**.  Nothing in this Agreement is intended or shall be deemed to constitute a partnership, agency, employer-employee, or joint venture relationship between Backertop Entities, on one hand, and ASSA ABLOY and its Affiliates on the other hand.  Neither Backertop Entities nor ASSA ABLOY and its Affiliates shall incur any debts or make any commitments for the other.

11. **NO ADMISSION OF INFRINGEMENT**.  By entering into this Agreement, ASSA ABLOY and its Affiliates do not admit, and deny, that they infringe any of the Covered Patents. Further, this Agreement is a litigation settlement of disputed claims, and not an acknowledgement that ASSA ABLOY and its Affiliates needs a license to any of the Covered Patents in order to make, have made, sell, offer for sale, import or export any product, software, website or service.

12. **GOVERNING LAW; JURISDICTION**.  This Agreement shall be construed, and the relationship between the Parties determined, in accordance with the laws of the State of Delaware, notwithstanding any choice-of-law principle that might dictate a different governing law.  The Parties agree (a) that all disputes and litigation regarding this Agreement, its construction and matters connected with its performance be subject to the exclusive jurisdiction of the state and federal courts located in the District of Delaware (the "Court"); and (b) to submit any disputes, matters of interpretation, controversies, or enforcement actions arising with respect to the subject matter of this Agreement exclusively to the Court.  The Parties hereby waive any challenge to the jurisdiction or venue of the Court over these matters.

13. **SEVERABILITY**.  If any provision of this Agreement is held to be illegal or unenforceable, such provision shall be limited or eliminated to the minimum extent necessary so that the remainder of this Agreement will continue in full force and effect and be enforceable.  The Parties agree to negotiate in good faith an enforceable substitute provision for any invalid or unenforceable provision that most nearly achieves the intent of such provision.

14. **NO PRESUMPTION AGAINST DRAFTING PARTY.**  Each Party acknowledges that such Party has been represented by legal counsel in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the drafting Party has no application and is expressly waived.

15. **ENTIRE AGREEMENT**.  The Parties acknowledge, accept, warrant and represent that (i) this is an enforceable agreement; (ii) this Agreement embodies the entire and only understanding of each of them with respect to the subject matter of the Agreement, and merges, supersedes and cancels all previous representations, warranties, assurances, communications, conditions, definitions, understandings or any other statement, express, implied, or arising by operation of law, whether oral or written, whether by omission or commission between and among them with respect to the subject matter of the Agreement; (iii) no oral explanation or oral information by either Party hereto shall alter the meaning or interpretation of this Agreement; (iv) the terms and conditions of this Agreement may be altered, modified, changed

12

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

or amended only by a written agreement executed by duly authorized representatives of the Parties; (v) the language of this Agreement has been approved by counsel for each of them, and shall be construed as a whole according to its fair meaning; and (vi) none of them (nor their respective counsel) shall be deemed to be the draftsman of this Agreement in any action which may hereafter arise with respect to the Agreement.

16. **MODIFICATION; WAIVER.**  No modification or amendment to this Agreement, nor any waiver of any rights, will be effective unless assented to in writing by the Party to be charged, and the waiver of any breach or default will not constitute a waiver of any other right hereunder or any subsequent breach or default.

17. **CONSTRUCTION; LANGUAGE.**  Any rule of construction to the effect that ambiguities are to be resolved against the drafting party will not be applied in the construction or interpretation of this Agreement.  As used in this Agreement, the words "include" and "including" and variations thereof, will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words "without limitation." The headings in this Agreement will not be referred to in connection with the construction or interpretation of this Agreement. This Agreement is in the English language only, which language shall be controlling in all respects, and all notices under this Agreement shall be in the English language.

18. **COUNTERPARTS.**  This Agreement may be executed in counterparts or duplicate originals, both of which shall be regarded as one and the same instrument, and which shall be the official and governing version in the interpretation of this Agreement.  This Agreement may be executed by facsimile signatures or other electronic means and may be exchanged electronically and such signatures shall be deemed to bind each party as if they were original signatures.

*[Signature Page Follows]*

13

**BACKERTOP0029**
Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be signed below by their respective duly authorized officers.

14

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

**Backertop Licensing LLC**

By: _____

Name: _____Lori LaPray_____

Title: _____Managing Member_____

Date:_____

**Mavexar LLC**

By: _____

Name: _____Gautham Bodepudi_____

Title: _____Managing Member_____

Date: _____

**IP EDGE LLC**

By: _____

Name: _____Gautham Bodepudi_____

Title: _____Managing Member_____

Date: _____

**ASSA ABLOY AB**

By: _____

Name: _____

Title: _____

Date: _____

15

**BACKERTOP0031**
Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

**August Home Inc.**

By: _____

Name: _____

Title: _____

Date: _____

16

**BACKERTOP0032**

Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

**EXHIBIT A**

US 9,332,385

US 9,654,617

US 10,728,382

17

**BACKERTOP0033**
Confidential Attorney-Client Privilege and/or Confidential Common Interest Attorney-Client Privilege

April 24, 2022 ("Effective Date")

Lori LaPray
Managing Member
Backertop Licensing LLC
2100 14th Suite 107 PMB 1044
Plano, TX 75074-6444

Re: Consulting Services

Dear Ms. LaPray:

This agreement confirms that **BACKERTOP LICENSING LLC** ("Client"), a limited liability corporation organized under the laws of Texas, with a principal place of business at **2100 14th Suite 107 PMB 1044 Plano, TX 75074-6444**, is engaging **MAVEXAR LLC** ("Consulting Company"), a limited liability company incorporated under the laws of Texas, having its principal place office at **2150 S. Central Expressway, Suite 200, McKinney, TX 75070** to provide consulting services provided by the terms and conditions below.

I.      **RESPONSIBILITIES**

The Consulting Company shall provide non-legal services, including one or more of the following: (a) identify companies that potentially infringe on the rights covered by the patents owned by Client ("the Patents"), (b) assist Client in monetizing the Patents; (c) assist in identifying products and/or services covered by the Patents; (d) select and negotiate rates to enable retention of counsel; and (e) manage counsel as necessary during the course of litigation and licensing efforts.

Client understands that Consulting Company is not a law firm, accounting firm, tax advisory, or the like. Client will seek appropriate third party accounting, tax, legal or similar advisory services. Client agrees to maintain clear and exclusive title to the Patents, and not incur any liens, encumbrances, or third party claims with respect to the Patents.

The parties understand that Consulting Company is not a fiduciary of Client, and will act as an independent contractor. In addition, Consulting Company is not an affiliate of Client, and does not control, directly or indirectly, Client.

Both parties agree to take all reasonable actions required to maintain confidentiality of this Agreement and of any information disclosed throughout the term of this Agreement. Both companies agree to maintain all financial and other records,

EXHIBIT

O8

sufficient for determining each party's respective obligations under this Agreement. Such records of each party shall be promptly made available to the other party via written request from the requesting party.

## II.    COMPENSATION

Client agrees that all Gross Recoveries shall be deposited into a lawyer's trust account (IOLTA account) designated by Consulting Company.  Client agrees that Consulting Company shall be reimbursed for all Costs and Expenses from Gross Recoveries. In exchange for the services provided by Consulting Company in the first paragraph of Section I of this Agreement, Client agrees to pay and Consulting Company shall be paid from Net Proceeds ("Consulting Fee"), in accordance to the percentages shown in the chart below:

|  | Consulting Company | Client |
| --- | --- | --- |
| Net Proceeds | As agreed by Client and Consulting Company | As agreed by Client and Consulting Company |

"Gross Recovery" or "Gross Recoveries" is defined as the gross amount of any monies and other forms of consideration received through monetization of the Patents.  Gross Recovery shall include, without limitation, any and all settlement fees, licensing fees, fees from a sale, or other payment from other transactions, as well as, any other proceeds (including assets) related to the Patents.

"Net Proceeds" is defined as Gross Recovery minus Costs and Expenses.  Costs and Expenses include all costs and expenses incurred in relation to obtaining, creating, defending, or maintaining the Patents or monetization efforts such as (1) Litigation Costs incurred in connection with the monetization, licensing and/or enforcement of the Patents; (2) consulting and expert fees (e.g., infringement expert, validity expert, technical expert, damages expert(s)) and incurred in connection with the monetization, licensing and/or enforcement of the Patents; (3) reasonably-related costs incurred in relation to monetizing the Patents (e.g., incorporation fees, travel fees, hotel fees) before or after the Effective Date of this Agreement;(4) acquisition costs; (5) backend payments to any prior owners or prior consultants; (6) prosecution and other costs in relation to the monetization of the Patents before or after the Effective Date of this Agreement; and (7) costs and fees associated with any adversarial proceeding relating to the Patents, including but not limited to Inter Parties Review and reexaminations.  Net Proceeds resulting from Consulting Company efforts undertaken during the term of this Agreement, but received after the term of this Agreement shall be deemed to have been received during the term of this Agreement and shall be distributed in the manner described above, regardless of whether the Patents are still owned by Client at the time the proceeds are received.

"Litigation Costs" is defined as costs reasonably incurred, during the term of this Agreement, including but not limited to litigation and local counsel fees, whether on an hourly or contingent-fee basis, filing fees, court-ordered mediation fees, subpoena service fees, deposition transcripts, long-distance telephone charges, document retrieval and copying costs, attorneys' travel expenses, legal research and database fees, investigator fees, witness fees, expert fees, alternative dispute resolution fees, arbitration fees, deposition videos and transcripts and copy fees, fees associated with technical and graphic support for exhibiting videos and exhibits to the court and jury, and graphic design and construction fees for exhibits.

## III.    COSTS AND EXPENSES

Client is the sole owner and final decision maker on any and all decisions relating, either directly or indirectly, to the prosecution, litigation, licensing, and, more generally, monetization of the Patents.

For all Costs and Expenses relating to the monetization of the Patents, Consulting Company shall advance such Costs and Expenses as one or more loans to Client. Such loans are reimbursable from Gross Recovery.  In the event any such loan is not paid back in full from Gross Recovery, Client shall be responsible for full payment of all such loans. If Client fails to make such payment within 30 days following the termination of the final litigation filed pursuant to this Agreement, Consulting Company shall have all available recourse pursuant to law to obtain recovery for such loans.

Further, upon execution of this agreement, Client hereby grants to Consulting Company a lien on any Gross Recovery, to the full extent permitted by Texas law, to secure Consulting Company's Costs and Expenses reimbursable in accordance with this agreement.

Each Party shall bear its own costs and expenses relating to this engagement, including travel and office expenses such as copying, telephone, faxing, internet, etc.

Each party's reasonable costs and expenses related to the monetization and licensing of the Patents (*e.g.*, incorporation costs) are reimbursable from Gross Recovery received after the date that such cost and expenses are incurred.

## IV.    TERMINATION

In the event of a material breach on part of Client, Consulting Company may terminate this Agreement, provided Consulting Company provides Client with an opportunity to cure such material breach within ten (10) days, and provided that there is ten (10) days of written notice to Client prior to the termination.  In the event of such a termination, Client shall remain responsible for and pay the Consulting Fee to the Consulting Company as required by this Agreement.

In the event of a material breach on part of the Consulting Company, Client may terminate this Agreement, provided Client provides Consulting Company with an opportunity to cure such material breach within ten (10) days, and provided that there is ten (10) days of written notice to the Consulting Company prior to the termination. In the event of such a termination, Client shall pay, to Consulting Company, the amount of any unpaid Consulting Fee received prior to the breach, minus any damages directly resulting from the breach.

In the event Client sells or transfers a portion or all of the right, title, and interest in the Patents for non-monetary consideration, all provisions of Section VI shall survive and transfer with the right, title and interest in the Patents, and be binding upon the respective successors, permitted assigns, heirs, beneficiaries and personal representatives and any other party with right, title, and interest in the Patents.

At any time during the term or after termination of this Agreement, Consulting Company may request and Client shall furnish a record of all costs, expenses, revenues, and other financial data, incurred or received as of the date of any such request.

## V.   MISCELLANEOUS

    a.  This Agreement memorializes the parties' understanding that communications covered by the attorney-client privilege, work product immunity, or other privileges, are covered by a community of interest that exists between them with respect to the services provided under this Agreement. The parties intend that all applicable privileges and immunities are and will be preserved.

    b.  This Agreement may not be assigned by either party without the written consent of the other party.

    c.  Client understands and acknowledges that any efforts or legal action to enforce the Patents present the risk that at least one of the Patents may be found invalid or unenforceable. Consulting Company shall not be liable if any of the aforementioned risks materializes. Consulting Company shall not be liable for any consequential, incidental, indirect or special damages regardless of the form of action arising from or relating to this Agreement. In no event shall Consulting Company's liability under this Agreement exceed the amount of payments paid under this Agreement.

    d.  This Agreement represents the complete and exclusive statement of mutual understanding of the Parties and supersedes and cancels all previous and contemporaneous written and oral agreements and communications relating to the subject matter of this Agreement,

including but not limited to any and all term sheets exchanged between the Parties.

e.  This Agreement shall inure to the benefit of, and be binding upon the respective successors, permitted assigns, heirs, beneficiaries and personal representatives of the Parties.

## VI.    Confidentiality and Common Interest

a.  The parties to this Agreement agree to not disclose the conditions and/or existence of this Agreement without prior written consent from the other party.  Client further agrees to immediately notify Consulting Company of any contact made by the press, media, or any other third party regarding this matter, the Patent, and other licensing, litigation, and monetization activities relating to the Patent.

b.  Both Consulting Company and client acknowledge that there are shared common legal interests and that it is in both parties common and individual interests to share certain confidential communications and information during the course of this engagement.

c.  From time to time, mutual interests of both parties have been and will be best served by exchanging, whether orally or in writing, documents, factual materials, mental impressions, memoranda, interview reports, and other information (collectively, "Joint Materials").

d.  These Joint Materials are protected from disclosure to adverse or other parties as a result of attorney-client privilege, the attorney work-product doctrine, and/or other applicable privileges, immunities or confidentialities.

e.  This Agreement memorializes the parties' understanding that such joint materials and related communications are covered by a community of interest that exists between them and that all applicable privileges and immunities have been, are, and will be preserved.

**SIGNATURE PAGE**

We look forward to working with you.  Please sign below and return an executed copy to us.

Yours truly,


Mavexar LLC

By: _____
Sanjay Pant
Managing Member
Mavexar LLC
2150 S. Central Expressway, Suite 200
McKinney, TX 75070


**Acknowledged and Agreed:**



Backertop Licensing LLC (Client)


By: _____
Lori LaPray
Managing Member
Backertop Licensing LLC
2100 14th Suite 107 PMB 1044
Plano, TX 75074-6444

Date Signed: 4/24/2022